Jones, Chief Judge,
delivered the opinion of the court:
This case involves a sale of War Surplus material under a contract between the plaintiffs and the War Assets Administration.
. Both plaintiff corporations had their principal place of business in Cedar Rapids, Iowa. The Handler Motor Company was a dealer in Dodge cars and trucks and Plymouth, cars. The Mid-States Equipment Company was a corpora *862 tion that bad been reactivated for tbe purpose of dealing in War Surplus materials. All the stock of both corporations was owned by members of the Handler family. As a matter of convenience in discussion they will be treated without regard to the fact that they were separate corporations.
Between May and September 1946 several lots of surplus materials were purchased by plaintiffs.
In September 1946 the War Assets Administration offered for sale, through its sales office at Lordstown, Ohio, certain tire gauges.
During the spring of 1946 Harry Locketz and Leo Shaper, who were engaged in wholesaling automotive parts and equipment in La Crosse, Wisconsin, and who for a number of years had been jobbers for Schrader tire gauges, approached officers of the Handler Motor Company with the suggestion that the latter should go into the business of purchasing and reselling automotive parts which were being sold under the Surplus Property Act. An agreement was made whereby ■Shaper and Locketz were to act as buyers and sellers for plaintiffs, and receive one-half the profits, but would not share in the losses, except as to such merchandise as might be sold and not paid for. The entire operation was to be financed by the Handler Motor Company.
The matter was discussed and two men, Shaper and Handler, the latter an employee of the Handler Motor Company, went to Lordstown about September 24, 1946, and examined samples at the Lordstown Ordnance Depot.
The gauges were on display in pasteboard boxes bearing the name “Schrader.” One end of the boxes bore the legend
Schrader
ONE 7188B
T Service Tire Gauge
One or more gauges were on display outside the boxes. Except for a ring on at least one of the display gauges by which it could be hung on a nail or hook, the sample gauges were substantially the same as those acquired by plaintiffs. The card on the display table gave the manufacturer’s name and number and also the Federal stock number.
The tire gauges were offered for sale to jobbers at a unit price of $3.00 with a discount of 70 percent, or a net price *863 of 90 cents each. The established wholesale price of Schrader at that time was $3.00 for tire gauges.
A “Memo Order and Contract” for 50,000 gauges was prepared, taken to George N. Zahn, who was in charge of sales, and approved by him, whereupon Shaper delivered a check for $45,000, the amount of the purchase price.
The order contained the following:
All sales of automotive maintenance equipment are subject to the terms of the War Assets Administration Sales Conditions, Office of Surplus Property, Consumer Goods Division, as modified and printed hereunder, subject to any qualification which may be made in writing,
*****
4. All merchandise will meet U. S. Army issue specifications. All merchandise will be new.
5. Parts must be ordered by manufacturers’ part number or part numbers taken from Army Ordnance Supply catalogs.
* * * * ^
9. Sales are subject to such adjustment, upon the request of the purchaser, as the Director, Office of Surplus Property, Consumer Goods Division, War Assets Administration, or his designated representative, may, in his discretion, determine to be equitable under the circumstances. Requests for any such adjustment will be considered only if filed within 20 days after the date of the mailing of the notice of sale (or such order [other] period as may at any time be specifically allowed in writing) in the manner prescribed by applicable regulations or the Office of Surplus Property, Consumer Goods Division, War Assets Administration, copies of which may be obtained from that office, Washington 25, D. C., or any regional officer thereof. The determination of the Director, Office of Surplus Property, Consumer Goods Division, War Assets Administration, or his designated representative, shall in all cases be final.
Immediately after the approval of the sales contract, Zahn sent the document to the Ordnance Depot in another building from which was mailed to the Handler Motor Company a document titled “Sales Document, Copy No. 1, Buyer’s Invoice.” This document bore the following notation:
nr purchaser has not executed waa’s eorm op sales memorandum, the above property is sold subject to *864 THE TERMS ABOVE SPECIFIED AND THE CONDITIONS OF SALE. ON THE REVERSE SIDE HEREOF.
The 50,000 tire gauges were shipped to Handler Motor-Company about October 10,1946, and received about November 1, 1946.
After making the above purchase Shaper and Locketz discussed the matter with the plaintiffs and it was decided that, they had made a good purchase. Accordingly about September 30, 1946, Locketz went to Lordstown and purchased on behalf of plaintiffs another 50,000 of these tire gauges at the same price, subject to substantially the same conditions. These were shipped October 14, 1946, and were received about November 1,1946.
The plaintiffs established a sales price ranging from $1.30: to $1.95 each, depending on the number purchased. Sample gauges were sent to an extensive list of wholesalers. In November 1946 some 5,535 gauges were sold. In December 1946 Shaper and Locketz, who were handling the sales for the plaintiff, began to receive complaints that the gauges were inaccurate. They had between 200 and 300 tested and found them from two to five pounds inaccurate. These gauges were designed to record pressures of from 10 to 160 pounds. The record does not disclose the pressure at which the inaccuracies developed. Some' of the purchases were returned by jobbers, and the ones who returned them declined to make additional purchases.
About December 27, 1946, plaintiffs wrote defendant calling attention to the inaccuracies, stating that the gauges had become oxidized and asking the privilege of returning them for credit.
The War Assets Administration declined on the ground that the gauges had been delivered according to the terms of the agreement. This correspondence is set out in findings 13 and 14.
In early 1947 as a result of complaints and sales resistance that had developed plaintiffs reduced their schedule of prices. The gauges were all finally offered for sale on an “as is” basis, the total receipts for all gauges sold being $76,727.44.
The plaintiffs sue for the difference between that amount and $140,000 which they allege would have been the market *865 value liad tbe gauges been as represented. They claim a ¡breach of warranty on the part of the defendant.
The gauges were built to Government specifications. With -one exception they were the same as the Schrader Company had long been manufacturing. Prior to the war the barrel •of the gauge had been nickel coated both inside and oi¿tside. The outside coating simply improved the appearance, but ¡the interior coating served to prevent corrosion.
About the middle of 1942, due to war conditions, there was a scarcity of nickel, and the Schrader Company was unable to secure the quantity required for the manufacture ■of gauges under its Government contract. Kepresentatives •of the defendant and Schrader discussed the problem of whether the gauges could be manufactured without the use of nickel or by the use of a reduced amount. At the conference the Schrader representatives stated that they did not know what the shelf life or service life of the gauges would he without the use of nickel. One of them stated, however, that in his opinion they would have a minimum service life of one year.
As a result of the discussion it was decided that nickel would be made available for coating only the lower 3/8ths inch of the inside of the barrel where the piston remained at all times except when the gauge was in actual use. Because of the difficulty of coating the inside without at the same time making the application on the outside, both the interior and exterior of the barrel would be coated to the same extent. Accordingly the drawings for the Army gauge were thus modified and thereafter the gauges manufactured for the Army utilized only this limited amount of nickel. Schrader •also manufactured the gauge for the general trade in the same way as for the Army during the emergency period, but ■during that time the commercial sales were relatively small, •due to Government priorities.
A few months after the war Schrader began to use nickel •again, after it became available, and by the end of 1946 the nickel-plated gauges were available in sufficient quantities to meet orders. Schrader’s prices both during and after the war were substantially in excess of plaintiff’s prices.
Plaintiffs contend that the gauges were not new as repre *866 sented, that they were old, corroded, inaccurate tire gauges, and that this was a breach of seller’s implied warranty of merchantability.
Defendant responds that they were new in the sense that they were unused, that by the specific terms of the sale the-only warranty was as to the title, that they were manufactured in every way as Schrader had theretofore made them, with the exception of the limited use of nickel, and that this-was in accord with the Army specifications which restricted the use of nickel.
All of the gauges involved here were manufactured in accordance, with specifications applicable to Federal Stock No. 8-G-615 and they conformed to the Schrader 7188R gauge as that gauge was manufactured and sold during the war. They differed from the prewar and postwar gauges-only in the amount of nickel that was used in the manufacturing process. This tended to shorten the useful life of the-gauges and to affect their accuracy, but how much is not. satisfactorily shown by the evidence. The specifications under which these gauges were built contained no requirement, as to accuracy.
The plaintiffs claim that the gauges were not new. But they knew that they were buying surplus property more than a full year after the war at a price greatly below the regular-listed price for these gauges. True, some of the samples-had rings for hanging the gauges, and most of those which were sold did not have these rings, indicating that most of them were made prior to July 1943, when the specifications were amended to require rings. But as these rings were merely a matter of convenience, we think that is hardly sufficient to be the basis of a breach of warranty. The lack of nickel on the outside of the barrel as well as the priorities-due to the shortage of that metal were sufficient to put a purchaser on inquiry. This was surplus property and in the absence of express warranty is on a somewhat different basis-, from purchases in regular commercial channels.
Shaper and Locketz had for a number of years been in-the business of distributing auto parts and equipment. During the years involved they were jobbers for Schrader products, including gauges. They were not exactly infants in a *867 primeval wilderness. They induced the plaintiffs to make an agreement by the terms of which they were to do the buying and selling, but plaintiffs were to finance the entire operation and handle the receiving, shipping and storing of. all the materials and the billing. Shaper and Locketz. were to receive one-half of any profits, but were not to..share the losses.
Pursuant to this agreement they handled some rather large purchases of surplus property for plaintiffs, including head gaskets, battery pliers, automotive-type flashlights and brake drum leaves.
With this background of experience, it hardly seems probable that they were greatly deceived by the circumstances surrounding the contracts in question. They knew, every businessman knew, of the shortage of critical materials, especially nickel, during the war. They were familiar with these gauges, having been jobbers for them for some years. Having handled a number of war surplus materials in considerable quantities, they must have known that all these articles were manufactured during the war and frequently with substitute materials.
As to the samples, Mr. Shaper testified:
Q. What do you mean, they were on display such as they are here? Were they in a box like this [indicating] ?
A. They were in a box and there were some out of the boxes. There were possibly two or three samples laying there on the table for inspection and-
❖ ‡ >!« # #
Q. Were they gauges like those which are here in the courtroom today or did they have a ring on them?
A. Well, the gauge which we actually saw did have a ring on it where it could be hung1 on a nail or something like that to get it out of the way, but outside of the ring it appeared to be the same gauge there.
The absence of rings on most of the gauges plaintiffs actually received indicated that those gauges were manufactured before July 194.3, rather than after that date, but in any event during the war, and there is nothing to show that those manufactured prior to July 1943 were substantially different from those made after that date, or that the few *868 months’ difference would have made any material difference in their condition.
In the light of all these facts are we justified in finding a breach of warranty such as would form the basis of substantial recovery?
We think not. Perhaps the Government officials in charge could have been a little more careful as to the samples placed on display, or could have explained more fully the materials that had been used. But it must be remembered that the surplus property disposal was a tremendous undertaking involving thousands of articles and billions in value.'
One of the sales managers for the Schrader company testified that 15 of these gauges were sent in by PXandler for testing and the laboratory report of the Schrader Company was that 14 out of the 15 were mechanically perfect.
Viewing the entire record it hardly seems plausible that these experienced businessmen were misled to the extent that we should set aside a contract of this kind. Rather it seems more likely that while gauges were in short supply when the contracts were being negotiated, the fact that the prewar nickel-coated regular gauge became available in full supply soon thereafter had some effect on the market for the surplus product.
Aside from these questions paragraph 9 of the sales agreement, which was signed by plaintiffs, contains the following:
Sales are subject to such adjustment, upon the request of the purchaser, as the Director, Office of Surplus Property, Consumer Goods Division, War Assets Administration, or his designated representative, may, in his discretion, determine to be equitable under the circumstances. * * * The determination of the Director * * * or his designated representative, shall in all cases be final.
In addition, paragraph 10 of the sales agreement limited warranties, express or implied, to the matter of title.
We think plaintiffs are not legally entitled to recover, and the petition is dismissed.
Howell, Judge; Madden, Judge; Whitaker, Judge; and Littleton, Judge, concur.