## HITCHCOCK v. UNITED STATES.
### No. 15095.

District Court, E. D. Michigan, S. D. Nov. 29, 1940.

As Modified Jan. 7, 1941.

Ward H. Peck, of Detroit, Mich., for plaintiff.

Samuel O. Clark, Jr., Asst. Atty. Gen., Peter P. Gilbert, Asst. U. S. Dist. Atty., of Detroit, Mich., and Michael Gould and Andrew D. Sharpe, Sp. Assts. to Atty. Gen., for defendant.

PICARD, District Judge.

### Findings of Fact.

This is an action to recover the amount of certain income taxes which plaintiff claims were unlawfully assessed by defendant for the year 1932 in the sum of $6,397.30. The parties hereto have stipulated to practically all the facts and this court has made some findings. Briefly they are these:

On January 15, 1932, plaintiff owned 6,795 shares of S. S. Kresge Company which he started accumulating in 1920 when he first purchased 20 shares at a cost of $2,600. During the 12 years intervening, according to the stipulation, plaintiff acquired his stock through three acquisitions, the first being June 5, 1920, and by other purchases and stock dividends, this acquisition had grown to 1,845 shares, costing $5,709.63.

The second acquisition began November 7, 1923, and by exchange and stock dividends had grown to 2,250 shares, costing $25,020.

The third acquisition began June 18 and 19, 1924, by purchase of 120 shares and by exchange of stock and stock dividends the sum total had reached 2,700 shares, costing $45,654.

A final 50 per cent stock dividend was declared March 1, 1929. Between 1929 and 1932 plaintiff made many sales, both "long"

and "short", but the stipulation traces the three acquisitions as above indicated as of January 15, 1932 (see stipulations XXI and XXII).

At the beginning of 1932 plaintiff arbitrarily divided his Kresge holdings designating the lower numbers appearing in his certificates until he reached the 1,845 shares as of the first acquisition. He continued ad seriatim with the second acquisition until he reached 2,250 shares additional and the remaining 2,700 shares he placed with the third acquisition.

This court finds that stock of the Kresge Company increased in value over the 9 years from 1920 to 1929 so that the first stock purchased together with its accumulation cost plaintiff much less than stock which he purchased in succeeding acquisitions and that plaintiff so designated his stock as above stated solely for income tax purposes. Thus obviously the sale of his higher priced stock during the year 1932 would net him less profit than sale of stock which he had acquired back in 1920.

During the year 1932 this plaintiff made long sales of 2,300 shares of stock and delivered 3,200 shares to cover short sales made in the preceding year. His instructions to his broker, evidently carried out, indicated that he sold from the third acquisition first. As a matter of fact the chart which this court improvised indicates that he sold all but certificate No. 77671 for 65 shares from this acquisition. This stock had cost him $16.90 a share. From the second group of 2,250, which included 85 shares represented by certificate No. 31,252, he sold all but certificate No. 31253 for 100 shares. This stock cost him $11.12 a share. From the first acquisition he sold 3 stock certificates No. 31250, 31251 and the remaining 15 shares covered by certificate numbered 31252 and this stock had cost him $3.09. In assessing taxpayer, it was the claim of the Internal Revenue Department that the "first in, first out" rule should prevail, adding that throughout the years all plaintiff's stock had lost its identity and that he could not consistently trace a single share of Kresge stock held by him in 1932 as originating from any particular certificate of any designated acquisition. Defendant further claims that even after March 1, 1929, when the Kresge Company declared a 50 per cent stock dividend there had been innumerable long sales, short sales, transfers, exchanges, sales by certificate numbers and in "street" form, all of which further mixed plaintiff's holdings and eliminated all possibility of tracing his 1932 holdings to any direct source of origin.

This court is not in a position to determine by what method of computation or deduction the parties arrived at the conclusions set forth in paragraphs XXI and XXII of the stipulation. Doubtless taxpayer had been rendering his annual reports and paying income taxes every year so that together plaintiff and defendant were able to agree, for the purpose of this litigation, not only that there had been three distinct periods and blocks traceable to each acquisition, but the amount of shares to each acquisition is stipulated as part of the facts and were so presented to this court.

Nevertheless, if the government is correct in its claim that over a period of years from 1921 to 1929 augmented by brisk trading and exchanges from 1929 to 1932, taxpayer has lost all trace of the origin of his stock, then the profit or loss from sales made in 1932 must be computed under the "first in, first out" rule, to-wit, the stock of 1920 with its accumulations.

On the other hand, if taxpayer is correct, even if he sought to thus avoid income taxes, then he could properly designate which certificates of the 6,795 shares of stock he then held should be chargeable to each of the first, second, and third acquisitions and thus instruct that his broker sell from the third acquisition first.

The question, therefore, for this court to determine is: "Can the holder of a block of stock admittedly the result of three distinct periods of acquisition, the amount of each acquisition being also admitted, arbitrarily, at the beginning of a taxable year and before sale thereof, designate the certificates covering the stock for each period so that he may sell therefrom for income tax purposes the highest priced stock first and thus avoid the 'first in, first out' rule provided for by Internal Revenue Regulation 77 Article 58?"

### Conclusions of Law.

In the opinion of this court decision in this case hinges upon two points:

First, interpretation to be given to the Commissioner's regulations and particularly to the word "lot";

Second, a determination of whether the stock held by taxpayer had been sub-di-

vided into "lots", within the meaning of that word as interpreted by the courts.

Regulation No. 77, Article 58, is as follows: "When shares of stock in a corporation are sold from lots purchased at different dates or at different prices and the identity of the lots cannot be determined, the stock sold shall be charged against the earliest purchases of such stock."

■ It will be noted that the regulation does not contain the word "certificates" and in fact there are any number of determinations by the Board of Tax Appeals and the Courts holding that identity of stocks and blocks of stock may be determined in other ways than by certificate numbers. Helveing v. Rankin, 295 U.S. 123, 55 S. Ct. 732, 79 L.Ed. 1343; Fuller v. Commissioner, 1 Cir., 81 F.2d 176; Ford v. Commissioner, 33 B.T.A. 1229; Arrott v. Commissioner, 34 B.T.A. 133; Franklin v. Commissioner, 37 B.T.A. 471.

■ As a matter of fact in the case of James L. Rankin, Executor v. Commissioner, 84 F.2d 551, on rehearing by the Circuit Court of Appeals for the Third Circuit following decision of the Supreme Court, petitioner had ordered his broker not to sell one certain group of stock which he had purchased with money received from his father and on which stock dividends had been paid. The dividends had never been specifically set aside and the court upheld contention of petitioner that his instruction not to sell a specified block of stock of itself was sufficient to designate the stock from which sale was to be made, even though in ordering a certain sale he had not specifically again excepted the original stock which he had purchased with the money received from his father.

But let us for a moment return to the purpose of the regulations as arbitrarily enunciated by the Commissioner. Naturally where, in making up an income tax return, taxpayer is able to follow his stock as sold specifically by number, there is little room for difference of opinion. Such stock is purchased for so much and sold at a profit or a loss. But where there have been frequent purchases or sales of the same stock with additional stock dividends, so that all numerical or specific or "species" identity of the stock has been lost, the Commissioner was undoubtedly justified in laying down the regulation known as the "first in, first out" rule.

Otherwise the taxpayer could always claim that stock he sold was the one he had paid the most money for and without such regulation the Bureau of Internal Revenue would be at a decided disadvantage. However, the regulation was never intended to work an injustice to the taxpayer nor to deny him the right to sell his highest priced stock for income tax purposes. There is no questioning the right of any man to legally minimize the amount of taxes which he has to pay, be it income or in any other branch of taxation and it was never intended that an added impediment to the exchange and sale of securities could be introduced through any regulation.

So where the taxpayer is able to show that this part of his stock came from such and such an acquisition, it appears that courts have uniformly held that he had definitely established the identity of his stock.

■ In getting an interpretation of the word "lot" used in the regulation, we find it defined in Webster's New International Dictionary, Second Edition, as follows: "A number of associated persons or things taken collectively; as a lot of stationery; goods in lots; a lot of cattle." And in the same authority we have this definition for the word "block": "A quantity, number or section of things dealt with as a unit; as a block of shares or bonds; a block of seats."

Let us then substitute as we believe you should, the word "block" for the word "lot" in the regulation, since it is significant to this court that the Commissioner recognized that investors buying stock usually buy a certain amount of stock at one time; that later there might be stock dividends such as in the case at bar and then perhaps sale of a part of the purchased stock or the dividend addition. So if you bought 5 shares of stock at $5 a share and that stock increased by stock dividend to 10 shares, the 10 shares would be carried on your books at $2.50 a share. It is likewise well recognized that if a sale or exchange of stock is made, one does not keep track of whether the stock sold was from the original group, from a stock increase, or from other stock purchased later. Therefore, this court feels that what the regulation aimed to impress upon investors according to interpretations and decisions, is that the government is concerned not with specific certificates as

511

much as it is with cost of the "lot" or "block" of stock in each division. That is common sense and we believe it complies with the purpose of the regulation itself.

We come then to the next question which is not difficult for this court since the parties by stipulation have themselves divided this stock into "lots" or "blocks". In paragraphs XXI and XXII, the government and petitioner agree that the 6,795 shares of stock which petitioner owned on January 15, 1932, came from three distinct acquisitions. In the first acquisition is carried the stock that cost this plaintiff $3.09 a share. Out of all this stock held on January 15, 1932, the government by stipulation has agreed that 1,845 shares would be considered as in the first acquisition; that 2,250 shares, costing $11.12 per share, were the second acquisition, and 2,700 shares costing $16.90 per share, were from the third acquisition.

Now undoubtedly if such designation had been made in 1926 when the big stock split up (10 for 1) was declared, it would not have been difficult to follow the history of the stock to a rather definite source of origin. But as hereinbefore noted, from 1926 to 1932 there have been sales, transfers, purchases and exchanges of this Kresge stock by petitioner. Sometimes the stock was in street form; sometimes it was in his regular account; and sometimes in his special account. And while it would appear to the uninitiated that plaintiff had 6,795 shares of Kresge stock on January 15, 1932, the result, not of three acquisitions, but of three acquisitions plus various deals and exchanges of Kresge stock transacted in the meantime, the stipulation containing paragraphs XXI and XXII is there—explained to this court by supposing that by a system of elimination and recourse to past income tax returns of taxpayer, both parties were reasonably certain that the 6,795 shares owned by the taxpayer on January 15, 1932, was the stock he had obtained from those three sources. So we then have the parties agreeing that on January 15, 1932, the 6,795 shares owned by plaintiff should be definitely identified as coming not only from those three acquisitions, but the government agreeing to the amount to be chargeable against each lot.

Reasoning further we find that it is inferentially, if not directly admitted by the government, that when the stock split up was made back in 1926, plaintiff could have instructed the transfer agent to give him certain stock certificates for each acquisition and thus kept separate the stock by certificate number. But there is nothing in the law or regulations to compel him to do this and if he could have divided that stock in 1926 when he got it just because it was closer to the time when he received the increase in his holdings, why can't he make definite the stock which belongs to each acquisition by designating the stock bearing lower numbers as being in the first acquisition and ad seriatim through the third acquisition? Isn't this what was done and approved by the Board in the case of Ford v. Commissioner, 33 B.T.A. 1229?

Having been able to determine how much of his stock belonged to each lot, should he not then be permitted to make the result definite for all further calculations, or must he forever refrain from taking advantage of what has been determined upon so that he must continue future misunderstandings with the Bureau?

Defendant, in its argument, contends that if a broker is instructed to sell certain stock, but unintentionally sells other stock of taxpayer, that then the government is concerned with the stock certificate sold and in no wise is bound by instructions given a broker but not followed. With this contention we have no quarrel and we hold that the taxpayer is bound by a computation based upon the stock actually sold. In this connection the court is mindful of the evidence of the stipulation as a whole, which shows in each acquisition the number of shares received as a stock dividend March 1, 1929. This dividend stock totaled 2,265 shares, of which all but 65 shares were sold. These are directly traceable by number, and in the third acquisition that part of 900 shares actually sold has a cost basis of $16.90 per share; in acquisition number 2, that part of 750 shares actually sold has a cost basis of $11.12 per share; and in acquisition number 3, that part of 615 shares actually sold has a cost basis of $3.09 per share.

This opinion deals with the theory of law since the facts do not seem to be in question. In other words, it is our belief that taxpayer had the right under the stipulated facts in this action to enumerate by designation the stock which he claimed to be in each of the acquisitions other than shares received by dividends, designating the lower numbers on the stock certificates

he then held to the first acquisition and ad seriatim through the third acquisition. In those instances where sale was not made from the higher priced shares as evidenced by the above theory, the parties should have no trouble in arriving at a conclusion that is in conformity with the intention of this court.

Accordingly only such sales shall be counted as came from the acquisitions set up in the first, second, and third groups, as they correspond to the stock certificates after first allocating 900 shares to the third acquisition; 750 shares to the second; and the balance of the dividend shares, 615, to the third group.

This court therefore holds that the plaintiff must prevail in accordance with this opinion and a judgment be prepared accordingly for signature by the court.