### ROCHESTER IRON AND METAL CO.
#### v.
#### The UNITED STATES.
#### Cong. 1-59.

United States Court of Claims.
Dec. 11, 1964.

Davis and Collins, JJ., dissented in part.

F. Trowbridge vom Baur, Washington, D. C., for plaintiff. Manuel D. Goldman, Rochester, N. Y., of counsel.

Gerson B. Kramer, Silver Spring, Md., with whom was Asst. Atty. Gen., John W. Douglas, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS and COLLINS, Judges.

DURFEE, Judge, delivered the following opinion with which LARAMORE, Judge, concurs, and announced the judgment of the court:

1. This case was referred to us, and was heard prior to the Supreme Court decision in Glidden Co. v. Zdanok, 370 U.S. 530, 82 S.Ct. 1459, 8 L.Ed.2d 671 (1962), which raises doubts about the constitu-

This Congressional reference case presents the issue of whether or not a contractor who received 1,940 tons of steel less than the approximate total tonnage bid upon in an "as is, where is" contract has a legal or equitable claim against the Government for this shortage.[1]

In 1951 the State Department transferred responsibility for a large quantity of returned lend-lease steel to the Department of Defense, which in turn assigned the steel to the Philadelphia Ordnance District, Philadelphia, Pennsylvania. After disposing of part of the steel via a shipment to the Tennessee Valley Authority, the Ordnance District prepared an invitation for bids for the remaining steel. Early in 1953, pursuant to preparing such invitation for bids, the property disposal officer of the Ordnance District, Mr. Welsh, made calculations of the estimated tonnage of the remaining steel. The steel was stored in 27 piles, and in making the tonnage calculation, Mr. Welsh took measurements of each pile. He made allowances for the estimated space between the individual pieces of steel in each pile, and then converted the number of pounds per cubic foot into tonnage for each pile. Each pile was then allocated into one of three lots.[2]

The Ordnance District then issued the invitation for bids for the steel in each of the three lots. On April 27, 1953 lot No. 1, as advertised in the bid, contained *approximately* 8,700 tons of billets. Lot No. 2 contained *approximately* 5,400 tons of rounds, and in lot No. 3 there was *approximately* 1,765 tons of rounds. The invitation for bids advised and urged the bidders to inspect the lots prior to submitting the bids.

Section two of the invitation which pertained to the condition of the property, stated in pertinent part as follows:

tionality of having this court hear Congressional Reference cases.

2. An exact calculation of the tonnage of steel in each pile would have been quite costly, and would have taken several months to do.

"2. CONDITION OF PROPERTY.—All property listed herein is offered for sale 'as is' and 'where is,' and without recourse against the Government. * * * The description is based upon the best available information, but the Government makes no guaranty, warranty, or representation, expressed or implied, as to quantity, kind, character, quality, weight, size, or description of any of the property, or its fitness for any use or purpose, and no claim will be considered for allowance or adjustment or for rescission of the sale based upon failure of the property to correspond with the standard expected; this is not a sale by sample."

Under Section 21 of the invitation, title to the steel was to pass to the successful bidder upon payment in full of the purchase price; said purchase price in turn was to be based upon "the total *estimated* weights set forth in this invitation." [Emphasis added.]

Adjustments of money due under the contract were provided for in Section 22, which stated:

"Final adjustment of monies due from a buyer shall be firmed upon the actual weight of steel delivered. The weight certification of the carrier will be considered final. *Claims for an adjustment of monies due, or paid, must be made on or before 17 August 1953. Should there be no claim for adjustment, the approximate weights of each lot, as indicated in this invitation, shall be accepted as the final weight.*" [Emphasis added.]

Plaintiff's representatives, as advised and urged by the invitation, inspected the three lots before submitting their bid. They thereafter submitted their bid, and on June 1, 1953 defendant accepted plaintiff's bid as to lots 1 and 3, while accepting the bid of another company, Boston Metals Company, as to lot 2. Full payment was made by plaintiff to defendant on June 5, and pursuant to the terms of the contract, title to lots 1 and 3 became vested in plaintiff.

Plaintiff had intended to resell all of the steel it had purchased, and to have it loaded for shipment within a twelve-weeks' period after the passage of title.[3] Despite plaintiff's continuous advertising, there was little demand for the steel, and plaintiff was unable to sell the steel and thus obtain its exact tonnage by weighing the loaded cars before the final date of adjustment, August 17.

By letter of July 8 plaintiff wrote to the Philadelphia Ordnance District, and requested an extension of time for final adjustment to November 17, 1953. The request for extension of time was denied by defendant on July 27, 1953.

Thereafter, no further important events transpired in this case until more than two years later on November 21, 1955. On that date the Philadelphia Ore Dock Company (see footnote 3), discovered that there had been an overshipment of the estimated tonnage from lot 2 (owned by Boston Metals) of 2116.575 tons of steel. Plaintiff had by this time shipped only about one-half of its steel and subsequently requested a piece count of the remaining steel in April of 1956. On April 24, 1956 plaintiff was informed by Ore Dock that plaintiff was short in the neighborhood of 2,000 tons. A check of Ore Dock's records showed that no steel owned by plaintiff had been shipped out other than by plaintiff's orders. On October 11, 1956, after the last of plaintiff's steel was loaded for shipment, it was found that the total net tonnage stored by Ore Dock of plaintiff's lots 1 and 3 was 1940.002 tons short of the esti-

3. The steel was stored during this entire period in outside storage yards on the property of the Philadelphia Ore Dock Company pursuant to unloading and storage contracts executed between the defendant and Industrial Management International ("IMI"), an independent concern, and "IMI" and Philadelphia Ore Dock Company. Under these agreements a purchaser from the Government (Plaintiff in this case) was to receive Government storage rates for a period of twelve weeks after passage of title to the lots of steel.

mated weight contracted and paid for by plaintiff in its contract with defendant.

Since there were no mistakes either in loading the steel or in keeping the records of such loading and storage, the shortage by plaintiff and the overage by Boston Metals must be attributed to the method used by defendant of measuring the tonnage in each lot, as hereinbefore described. Defendant evidently had underestimated lot 2 to be some 2,100 plus tons less than the actual tonnage, and evidently had over-estimated lots 1 and 3 combined to be some 1,900 plus tons more than the actual tonnage.

Plaintiff's subsequent request for adjustment of the purchase price paid for the steel, in the form of a claim for $117,-913.20 for the 1940.002 tons of shortage in lots 1 and 3, was rejected by the Comptroller General. The reasons for rejection were, (1) that the contract was an "as is" and "where is" one, and (2) the final adjustment date under the contract was August 17, 1953.

We believe that these facts do not provide a basis for a claim, either legal or equitable, against the Government. Under the invitation for bids, prospective bidders were "invited and *urged*" to inspect the property before submitting bids. Plaintiff did inspect the property, and while a shortage would not have been apparent to the naked eye, the word *"urged"* as used in the invitation should have alerted plaintiff to the fact that the property might not exactly conform to defendant's description. This is especially true since the contract was an "as is" and "where is" one, with a specific disclaimer of warranty as to weight and size. Furthermore, the Government's invitation plainly stated that "the description is based on the best available information." If all this were not enough to alert plaintiff that there might be a possible discrepancy between the actual tonnage of the steel and the amount of tonnage listed in the invitation, then certainly, the word *approximate* as used to describe the amount of tonnage in the invitation should have revealed to plaintiff the fact that the amount might not be *exact*.

The very nature of an "as is" and "where is" contract serves notice upon a prospective purchaser that the risk of loss is on the purchaser. In other words, "Let the buyer beware." Such has been the established law for almost forty years. As this court stated in M. Samuel & Sons v. United States, 61 Ct.Cl. 373, 381–382 (1925):

> "This description alone would have been sufficient to put plaintiff on notice that there was no guaranty as to the character or the amount of material. It was visited with knowledge of the meaning of the expression 'as is, where is.' It means that the seller sells without guaranty as to the amount or condition of the material; that he sells what may be found in the lot; that he does not profess to know accurately himself the amount or character of the material, and that the purchaser must take his chances on what he will get."

It is apparent that the risks involved in purchasing the property were plainly known to plaintiff before the sale was made. The contract was consummated between the parties fairly and openly. Certainly this standard disposal contract was neither unduly broad nor oppressive. There is a broad policy reason for placing the risk upon the purchaser in such a contract. This policy was examined and explained in Dadourian Export Corporation v. United States, 291 F.2d 178, 182 (C.A.2nd Cir.), (1961):

> "By way of preliminary it is to be noted that this is no ordinary contract between buyer and seller for the purchase and sale of a valuable commodity. When the government sells surplus goods it is trying to dispose of a vast miscellany of used and unused property in an effort, so far as may under the circumstances be possible, to minimize its loss. Sales of this character are processed on a mass quantity basis by members of

the armed forces who seldom if ever have any expertise in the particular items which come to their warehouses and depots. Buyers of such surplus property know perfectly well that there is always the chance of buying property that may turn out to be of little value, or may develop into a great bargain with a huge windfall of profit. Accordingly, the government very properly has protected itself by formulating its contract for the sale of such surplus property so as to shift the risk from itself to the buyer. As Professor Corbin tells us, a party to a contract may agree to assume certain risks that in the absence of agreement the law would not cast upon him. See 3 Corbin, Contracts (1960), Section 598. * * *"

Such was the case here. Had plaintiff in this case received more steel than it bargained for, as did Boston Metals, then since this was an "as is, where is" contract, it could have rightfully kept the excess steel without incurring any legal or equitable liability to defendant for additional payment, because neither party requested an adjustment on or before August 17, 1953.

Plaintiff asserts that its letter of July 8, 1953 to defendant in which it requested an extension of time for final adjustment until November 17, 1953, constituted a claim for adjustment of moneys paid in accordance with Section 22 of the contract. As will be remembered, Section 22 required all final claims to be made on or before August 17, 1953. Plaintiff analogizes this situation to cases which have allowed recovery under a changes clause in Government contracts. In those situations a notice of an intention or desire to submit a claim has been held to constitute the actual assertion of the claim. We cannot accept this analogy however, as plaintiff here merely made a request for an extension of time, stating:

"We note that Paragraph 22 of the Invitation to Bid states that final adjustment will be made upon actual weight of steel delivered.

"We do not believe it will be possible for us to move the entire lot before August 17, 1953. We request an extension for final adjustment until November 17, 1953."

Plaintiff did not express anywhere in this request a desire to submit a claim for adjustment, or any express concern about a possible shortage. There is no way in which this unequivocal language can be construed as "a claim for adjustment of monies due, or paid" under Section 22 of this "as is, where is" contract.

It should perhaps be mentioned now that even if defendant had granted plaintiff's request for extension of final adjustment until November 17, 1953, we are unable to see how plaintiff's position would have been materially aided. Plaintiff was unable to sell all of its steel until October 11, 1956. It was only then that the exact final shortage was ascertained. The three months' extension of time could in no way have helped plaintiff sell the steel in what appears to have been a buyer's market. Since the exact amount of tonnage could not be known until the steel was sold and loaded for shipment,[4] and since plaintiff was unable to sell the steel by November 17, 1953, the requested date for extension, plaintiff can hardly be said to have been prejudiced by the Government's denial of extension for final adjustment.

Plaintiff finally contends that the Government has been unjustly enriched since it received payment for 1940.002 tons of steel which plaintiff never received. In answer to this, we have only to reiterate the point already made that this was an "as is, where is" contract. Plaintiff received all that the Government promised to give, which was *approximately* 10,464 tons of steel. As was previously shown, the "as is, where is" aspect of the contract should have put plaintiff on notice that the amount of tonnage listed in the contract probably was not an exact amount. When plaintiff did not make

---

4. The contract contemplated that final adjustment would be based upon the weight certification of the carrier. (Section 22.)

a claim for final adjustment before August 17, 1953, the approximate weight was accepted as the final weight. It is unfortunate that plaintiff was unable to find a buyer for the steel immediately after it acquired it; however, we see no reason to penalize the Government for the market decline in the demand for steel.

Accordingly, on all the facts and circumstances contained in the record, and upon the findings of the Commissioner which we have reviewed, and in which we concur, we conclude that plaintiff has not stated a claim, either legal or equitable, against the United States.

As emphasized in Dadourian Export Corporation v. United States, supra:

" * * * this is no ordinary contract between buyer and seller for the purchase and sale of a valuable commodity."

The contract here was one in which the two parties knew and assumed both the risks and benefits in an "as is, where is" agreement.

This opinion, together with the findings of fact of Commissioner Richard Arens, which are herein adopted with minor corrections, will be certified to the Congress pursuant to Senate Resolution 117, 86th Congress, 1st Sess.

COWEN, Chief Judge (concurring).

I concur in the result reached in the opinion of Judge DURFEE, but in view of the fact that this is a Congressional reference case, I feel that the opinion takes too restrictive a view of the equitable aspects of plaintiff's claim. A 20-percent shortage in the weight of the steel sold to the plaintiff hardly makes the Government's estimated weight approximate. Therefore, in the absence of other facts, I would find it difficult to hold that plaintiff has no equitable claim solely on the basis of the "as is, where is" provisions of the contract.

There are, however, other facts which, in my opinion, strongly support Judge DURFEE's conclusion.

As noted in his opinion, section 22 of the contract provided that final adjustment of moneys due from the buyer should be made upon the actual weight of the steel delivered, as shown by the certificates of the carriers. Unless a claim for adjustment, based on the actual weight shown in the carriers' certificates, was made on or before August 17, 1953, both the Government and the buyers agreed to be bound by the approximate weight stated in the contract under which title to the steel passed to plaintiff on June 5, 1953. There were cogent reasons for the inclusion of this provision in the contract. It was important to the Government that the rights and obligations of the parties be determined at an early date so as to minimize the Government's loss by relieving it from continued responsibility for the steel inventory. If the parties had availed themselves of this provision of the contract, both plaintiff and Boston Metals would have received and paid for the steel upon the basis of the actual rather than the estimated weights. However, there was a drop in the steel market. In order to avoid a loss and to sell the steel at a profit, both plaintiff and Boston Metals assumed the risk of accepting the Government's estimated weight as final and shipped out the steel over protracted periods of time. Boston Metals made its final shipment on November 21, 1955, nearly 2½ years after the sale. It was then discovered that Boston Metals had received more than 2,116 tons of steel in excess of the estimated quantity for which it had paid. Plaintiff took even longer. The last of its steel was not loaded until October 11, 1956, 3 years and 4 months after the date of sale. At that time, it became evident, not only that plaintiff had received 1,940.002 tons of steel less than the estimated quantity for which it had paid, but that the Government had delivered to the two purchasers 176 tons of steel for which it had received no payment. This loss to the Government resulted from the fact that both plaintiff and Boston Metals elected to finalize the contract on the basis of the estimated rather than the actual weights of the steel.

After title to the steel passed to plaintiff, it elected to use the Philadelphia Ore

Dock Company as its warehouseman. Thereafter, the Government had no control or surveillance over the steel inventory. Throughout the 3-year period, plaintiff had the means for acquiring definite information about the quantity of steel contained in its two lots, but there is no evidence that it made any effort to inventory, survey, or otherwise determine the quantity of steel it had in its possession until April 1956. During that month, the Philadelphia Ore Dock Company, at plaintiff's request, took a piece count which revealed that plaintiff was short about 2,000 tons of steel. Even then, plaintiff did not notify defendant about the shortage but waited until October 26, 1956, when it advised the Philadelphia Ordnance District that the shortage existed.

In the light of these facts, it seems to me that any equitable claim which plaintiff might have had was nullified by its long delay in ascertaining and giving the Government notice of the shortage. As a result, the Government was deprived of the opportunity to determine the cause of the shortage and to verify the extent thereof. To hold otherwise, would make the Government the insurer of plaintiff's inventory and its profit for a period of more than 3 years after the right of either party to claim an adjustment on the basis of the actual weight of the steel had terminated.

DAVIS, Judge (concurring in part and dissenting in part).

I agree that the plaintiff has no legal cause of action—since it failed to file a claim for adjustment on or before August 17, 1953—but I think that it does have an "equitable" claim in the sense that that concept has developed in our Congressional-reference jurisprudence.

The ultimate fact is that plaintiff has paid, at the agreed rate, for some 1940 tons of steel which it did not receive and the Government has obtained compensation for 1940 tons which it did not deliver. Usually, such a situation suggests an inquiry whether the Government is retaining monies it cannot morally keep. I am not convinced by the reasons given in Judge DURFEE's and the Chief Judge's opinions for concluding that that should not be the result here. The pertinent factors seem to me to favor plaintiff.

The absence of a claim by August 17, 1953, is not a bar to "equitable" recovery; that provision of the contract is close kin to the statute of limitations which has long been held avoidable, in a Congressional reference, where adequate cause is shown.[1] To my mind there was good reason for plaintiff's failure to have the steel weighed (or the tonnage otherwise calculated) before it was shipped out. The only practical method of determining the tonnage was at the time the steel was loaded for shipment. "It would have been virtually impossible to calculate the exact amount of steel in each of the several piles, and it would have been very costly and would have taken months to weigh the steel in each of the piles." Finding 8(a). For quite a while after plaintiff bought the steel it could not resell much of it, although it advertised continuously and nationally. Its first big sale was at a loss of $11 a ton. Finding 14. The fair inference from the record is that plaintiff continued to sell the steel, in lots, as soon as it received a reasonable price for the particular batch. There is no reason to believe that sales were postponed because plaintiff felt that the Government would ultimately reimburse it for any deficiencies and thus insure its profits. In fact, the first indication that the piles were short did not come until April 1956; and it was not until October 1956 that the last of the steel was loaded for shipment, and plaintiff really knew how short its purchase was. Findings 23–24. With respect to the "equitable"

1. See 28 U.S.C. § 2509; Clark v. United States, Ct.Cl., Cong. No. 10–58, decided July 17, 1964, slip op., p. 2; S.N.T. Fratelli Gondrand v. United States, Ct. Cl., Cong. No. 7–58, decided June 12, 1964, slip op., p. 9; Ralph Feffer & Sons v. United States, Ct.Cl. Cong. No. 5–60, decided June 12, 1964, slip op., pp. 2–3; Erie Railroad Co. v. United States, 156 F.Supp. 908, 909, 140 Ct.Cl. 398, 399 (1957); Zadeh v. United States, 111 F. Supp. 248, 250, 124 Ct.Cl. 650, 653 (1953).

aspect of plaintiff's claim, this delay in weighing was both reasonable and excusable. Plaintiff was not casually or underhandedly deferring ascertainment of the weight until the most favorable time; rather, in the light of business realities, plaintiff had little choice. The prohibitive expense of having the piles weighed before the steel was loaded would probably have led to a large overall loss on the transaction. It was therefore appropriate and practical, in the common sense world of business, to await the weighing which was necessarily incident to shipping. Similarly, plaintiff should not be penalized—in this special type of proceeding in which it seeks relief only from the overpayment—because it did not accelerate the shipments by selling at a great loss or at too low a price.

Nor does the characterization of the contract as an "as is" sale of surplus property settle the issue of "equitable" entitlement for steel not received. The contract must be read as a whole. The plaintiff knew that the weights indicated by the Government were estimated and approximate; it knew, too, that the Government was making no guaranty or representation that any particular tonnage was included in the piles. These provisions meant that, so long as the buyer paid only for the tonnage he received, he could not complain that the amounts actually delivered varied from those set forth in the invitation. But these clauses did not say or provide that a purchaser who paid the bid price for 10,465 tons had no recourse if he received 1940 tons less. This was *not* the kind of surplus sale in which a lot is offered "as is, where is" at one total price, with all risk as to the number of component units placed squarely on the purchaser. The contract specifically contemplated an adjustment based on the tonnage actually delivered (paragraphs 8 and 22); to that end the bids were not to be submitted as a total dollar amount but "on a net ton basis" (paragraph 19). The transaction, to that extent, was not at the buyer's risk—was not fully an "as is, where is" sale. As to amount, the buyer had a very impor-

tant right; he could obtain an adjustment if he paid for more steel than he got. True, the adjustment was to be claimed by a set date (August 17, 1953), but I have already given the reasons why I believe that this time-limitation should be removed in this "equitable" proceeding. The plaintiff could not reasonably have been expected to weigh in advance, and after the sale there was solid excuse for waiting until the steel was resold and shipped. The excess payment was discovered and claimed in a reasonable time.

It is not inequitable to the Government, in the moral sense, to require it to give up this excess payment. It holds money for which it did not deliver steel. The defendant has argued, however, that the plaintiff's delay has added materially to the difficulty of combatting the inference that the Government originally miscalculated the tonnage in the piles. The Trial Commissioner and the court have found, and I agree, that the discrepancy was due to an initial governmental error of this kind, not to later activities for which the Government cannot be held responsible. Aside from defendant's unpersuasive speculation before us, there is little indication that defendant's proof on this point would have been substantially better if the shortage had been discovered late in 1953 or in 1954 or 1955, instead of 1956. The vague possibility that the delay hampered defendant's proof should not outbalance the plaintiff's considerable equity. It is also said that the Government would be prejudiced, if relief were given here, because the Government cannot recover for an underpayment by a purchaser (as in the related instance of Boston Metals). One answer is that in these Congressional references the United States is often held "equitably" liable even though, if the shoe were on the other foot, there could be no recovery at law. The sovereign has many special protections, but it has also followed, in proceedings under 28 U.S.C. §§ 1492 and 2509, the policy of *noblesse oblige*. In addition, it does not seem an unfair discrimination to make the Government abide by the estimated weights it itself has established while permitting relief to the purchaser on the

basis of the actual tonnage.[2] And since the contract did not put the entire risk as to amount on the purchaser, the defendant should have no more of a vested right in the date of August 17, 1953, than it has, in this class of proceeding, in other time-bars.

I would determine that plaintiff is equitably entitled to recover $117,913.20, without interest.

COLLINS, Judge, joins in the foregoing opinion concurring in part and dissenting in part.

---

2. Of course, Boston Metal's gain cannot be set off against this plaintiff's loss. The companies are not connected.