**HARRY THURESSON, INC.**

v.

**The UNITED STATES.**

**No. 198–70.**

United States Court of Claims.

Jan. 21, 1972.

Edward D. Friedman, Washington, D. C., for plaintiff. Lester P. Schoene, Washington, D. C., attorney of record. Peter A. Greenburg, Washington, D. C., of counsel.

Gerald L. Schrader, Washington, D. C., with whom was Asst. Atty. Gen. L. Patrick Gray, III, for defendant.

Before COWEN, Chief Judge, and LARAMORE, Judge, DURFEE, Senior Judge, DAVIS, COLLINS, SKELTON, and NICHOLS, Judges.

ON DEFENDANT'S AND PLAINTIFF'S MOTIONS FOR SUMMARY JUDGMENT

COWEN, Chief Judge:

This is an action for breach of contract arising out of a sale of surplus property by the Department of Defense. The parties have filed cross-motions for summary judgment. We have concluded that the Government breached the guarantee provisions of the contract, and that plaintiff is entitled to recover an amount to be determined in a proceeding pursuant to Rule 131(c).

The United States Air Force constructed and operated a large facility at Offutt Air Force Base, Nebraska, at which it developed and processed photographs taken by reconnaisance aircraft. The operation of this facility generated a liquid waste chemical known as used "hyposolution," from which pure silver can be reclaimed.

On April 28, 1966, the Defense Surplus Sales Office at Fort Worth, Texas, issued an Invitation for Bids for the purchase of the silver contained in all of the used hyposolution which the Offutt laboratory would generate during a 34-month period beginning June 1, 1966, and ending March 31, 1969. The invita-

tion estimated the annual generation of silver at 110,000 troy ounces, or, as stated in the Award, 311,666.6666 troy ounces for the entire contract period.

The invitation required the successful purchaser to furnish, install, and maintain certain essential collection, storage, and disposal equipment at his own expense. Specifically, the required equipment included a collection tank which would be connected to the photo-processing laboratory, a 5,000-gallon storage tank, automatically activated pumping and metering equipment, and all necessary, interconnecting piping and valves. As the used hyposolution accumulated in the tanks, the purchaser was to periodically remove it in order to leave sufficient storage space to accommodate an uninterrupted flow of the solution from the laboratory. Upon removal, the purchaser could either transport the hyposolution to his own plant and extract the silver there, or he could install additional machinery and extract the silver at the base.

The invitation further provided that payment for the silver would be on a unit-price basis. The amount of silver delivered to the purchaser would be computed by chemical analyses of samples taken from the hyposolution stored in the purchaser's tanks. The price per troy ounce to be paid to the Government would vary according to the current market price of silver in the American Metal Market, computed by deducting the purchaser's bid from the current market price of silver.

In response to the invitation, plaintiff, Harry Thuresson, Inc., submitted its bid price for the silver, its proposal for equipment installation, and a bid-deposit of $17,886, representing 20 percent of the purchase price, for the first year's estimated generation of silver. On May 11, 1966, the Government awarded the contract to plaintiff, whereupon plaintiff subsequently installed the required equipment at the Offutt laboratory in time to begin performance on June 1, 1966. According to plaintiff, the equipment was installed at a cost of $26,194.-66.

As plaintiff performed the contract, it became apparent that the quantity of hyposolution generated by the laboratory would be considerably less than expected. In contrast to the Government's estimate in the invitation that 110,000 troy ounces of silver would be generated annually, only 198 troy ounces were recovered during the last seven months of 1966 when the contract was in effect. During the entire period of the contract, the Government delivered a total of 5,308.08 troy ounces, some 98.3 percent less than the 311,666.6666 troy ounces estimated in the Award for the 34-month period.

Plaintiff here seeks to recover the profit it expected to make on the contract, based upon its theory that the Government was obligated to deliver a specific minimum quantity of silver. Defendant denies liability on the following grounds: (1) the quantities estimated in the contract were not guaranteed; (2) the provision in the contract reserving to the Government the right to vary the quantity delivered by 50 percent did not require it to deliver at least 50 percent of the amount estimated; and (3) the Government's liability is limited to refunding the amounts paid by plaintiff for the silver actually delivered.

In support of its contention that the quantity estimated in the contract was not guaranteed, defendant points to Article 2 of the General Sales Terms and Conditions, which states in pertinent part:

2. CONDITION AND LOCATION OF PROPERTY. Unless otherwise specifically provided in the Invitation, all property listed therein is offered for sale "as is" and "where is." * * The description is based on the best available information. However, the Government makes no warranty, express or implied, as to quantity, kind, character, quality, weight, size, or description of any of the property or its fitness for any use or purpose. Except as provided in Conditions No. 8

and 10, no request for adjustment in price or for rescission of the sale will be considered. * * *

As defendant correctly points out, this court has frequently held that the "as is, where is" clause is a valid disclaimer of warranty by the Government. *See, e. g.,* Aircraft Associates Co. v. United States, 357 F.2d 373, 375–376, 174 Ct.Cl. 886, 891–892 (1966); Rochester Iron and Metal Co. v. United States, 339 F.2d 640, 643–644, 168 Ct.Cl. 422, 427–428 (1964), and cases cited therein; Alloys and Chemicals Corp. v. United States, 324 F.2d 509, 163 Ct.Cl. 229 (1963). The clause serves to place a prospective purchaser on notice that he assumes practically all risks of loss. Rochester Iron and Metal Co. v. United States, supra. Cf. Dadourian Export Corp. v. United States, 291 F.2d 178, 182 (2d Cir. 1961).

We would be inclined to agree with the Government's contention if the "as is, where is" clause were the only provision of the contract relating to warranties. However, the invitation also contained as a special condition a Guaranteed Descriptions clause which, we think, distinguishes this case from the typical "as is, where is" sale:

### SPECIAL CONDITION—GUARANTEED DESCRIPTIONS

(1) Except as provided in sub-paragraphs (2) and (3) of this clause, and with the exception of stated opinions as to the condition of the property, and notwithstanding any other terms and conditions of this Invitation for Bids to the contrary, the Government hereby warrants and guarantees that the property to be delivered to the Purchaser under any contract resulting from this Invitation for Bids will be as described in the Invitation for Bids. * * *

(2) Estimates as to "weight" of property offered for sale by the "unit" are not guaranteed. However, estimates as to the quantity of property offered for sale by the "lot" are guaranteed to be accurate within the following limits: (a) estimated quantities of less than 25 are guaranteed to be accurate, (b) when the estimated quantities are 25 or more, the Government guarantees that it will deliver no less than 75% of the estimated quantities. While estimated shipping weights are not guaranteed, in the event that the property is offered for sale by the "lot" and that lot is described by weight and not by estimated quantities, the Government guarantees that it will deliver no less than 75% of such weight. Provided, however, that no adjustment will be made under the provisions of this sub-paragraph unless the claim of shortage is made prior to the removal of the property.

* * * * * *

From an examination of the prefatory phrases of the two quoted provisions, it seems clear that the guarantee was intended to vitiate the usual effect of the "as is, where is" clause. The latter clause disclaims all warranties "[u]nless otherwise specifically provided in the Invitation;" the guarantee applies "notwithstanding any other terms and conditions of the Invitation for Bids to the contrary * * *." This construction of the two clauses is confirmed by the Government's statement at the top of the General Information and Instructions page of the Invitation for Bids, that "YOUR ATTENTION IS INVITED TO THE GUARANTEED DESCRIPTION CLAUSE ON PAGE 3. ALL FACTUAL INFORMATION CONTAINED IN ITEM DESCRIPTIONS IN THIS CATALOG IS GUARANTEED TO BE ACCURATE." [Emphasis in original.]

We think that a reasonable construction of the contract compels the conclusion that the Government's guarantee here extends to its estimates of quantity. The first paragraph of the Guaranteed Descriptions clause states in broad, general terms that "the property * * * will be as described in the Invitation * * *." There are no qualifications to this statement, except for "stated opinions as to the condition of the property," and for those explicit limitations of the

succeeding two paragraphs of the clause which are incorporated by reference. The clause specifically refers to quantity in the second paragraph, although not in the context of this case, and so does the "as is, where is" clause, which the guarantee was intended to supersede. It would be reasonable to conclude, then, that the Government had quantity in mind when it drafted the guarantee. Whether it did or not, however, would seem to be irrelevant under these circumstances, since the references to quantity in both the "as is, where is" clause and in subparagraph 2 of the guarantee at least served to put the Government on notice that a warranty of quantity might be asserted. In the absence of a specific disclaimer to its broad statement of guarantee, we will assume that the Government intended to guarantee its estimates of quantity. *See* Benjamin v. United States, 348 F.2d 502, 516, 172 Ct.Cl. 118, 138 (1965).

This construction of the clause is buttressed by the circumstances of the transaction here. In order to perform the contract, the purchaser was required to make a substantial, initial capital investment, an investment which a prudent contractor would be hesitant to make without some assurance that the contract would be profitable. Certainly, quantity was the most significant "unknown" factor in determining profitability, since it was impossible for prospective purchasers to estimate how much hyposolution would be generated at the Offutt laboratory. They were forced to rely on the Government's estimates in deciding whether to bid. No doubt the Government was aware of this, and we think it undertook to guarantee its quantity estimates as an inducement to bid.

The defendant asserts that the Government could not have intended to guarantee its quantity estimates, because it was impossible to forecast accurately how much hyposolution would be used at the laboratory. That depended, it says, on the number of reconnaissance photographs which the Air Force would take during the 34-month period, which in turn depended upon future military operations and other "inherently contingent" factors such as foreign policy decisions and weather conditions. We think the Government took these contingencies into account when it drafted the contract terms, but not by excluding estimates of quantity from the scope of the guarantee. Article AG of the contract, entitled "Adjustment for Variation in Quantity or Weight," provides that, where property is sold on a unit-price basis, the Government may vary the quantity or weight delivered by 50 percent from that listed in the invitation. This clause is a special provision which the Government inserts in extended-term contracts. It supersedes the standard adjustment clause in the General Sales Terms and Conditions, which permits only a 10 percent variance. We think that the Government did allow for the many "inherently contingent" factors which made an accurate estimate of quantity difficult, but it did so by giving itself more flexibility rather than by excluding estimates of quantity from the guarantee altogether.

Having determined that the Government guaranteed its quantity estimates, we are left with the question of how much silver it promised to deliver. Obviously it did not guarantee delivery of exactly 110,000 troy ounces per year. That figure was expressly stated to be "estimated," so that some variation would have to be permissible. The most logical answer to this question would be that the Government guaranteed to sell at least 55,000 troy ounces of silver per year, since the Adjustment for Variation in Quantity or Weight clause permits it to vary the quantity delivered by 50 percent. However, each party urges a different result.

The defendant contends that the adjustment clause does not obligate the Government to deliver at least 50 percent of the estimate. Under the defendant's interpretation, the purpose of the clause is solely to protect the interests of the Government; it confers no rights upon the other contracting party. De-

fendant argues that we should instead characterize this sale as an output contract, in which the Government promised only to deliver its actual output of the silver solution over the life of the contract, whatever that output may be. On the other hand, plaintiff says that the transaction here was a sale "by the lot," and that under subparagraph 2 of the guarantee the Government warranted delivery of at least 75 percent of the estimate. For purposes of this contention, plaintiff is willing to accept the defendant's argument that the adjustment clause is inapplicable, so that the 50 percent variation permitted by that clause does not expand the 25 percent variation sanctioned by that part of the guarantee dealing with sales by the lot. Alternatively, plaintiff argues that if a sale by the lot is not involved here, then the adjustment clause does indicate that the Government guaranteed to deliver at least 50 percent of the estimate.

The defendant's argument regarding the proper interpretation of the Adjustment for Variation in Quantity or Weight clause is directed more to the question of whether that clause, standing alone, guarantees delivery of a minimum quantity. We need not deal with this question here, since we have already held that, under the guarantee provision, the Government did guarantee to deliver *some* minimum quantity. Our inquiry here is directed solely to the question of whether the adjustment clause fixes the permissible limits of variation once it is determined that the quantity estimates are guaranteed. We think that it does. Even if the adjustment clause signifies nothing else, it at least indicates that the Government intended to deliver between 50 and 150 percent of the quantity estimated in the invitation. Coupled with the guarantee provision, we think that a reasonable interpretation of the two clauses indicates that the Government guaranteed to deliver at least 50 percent of the amount estimated.

The defendant has asked us to characterize the agreement here as a type of total output contract, in which the Government promised to deliver only that amount of silver solution which it actually used during the 34-month period of the contract. We agree that the transaction involved here resembles an output contract, but we do not think that a different label changes its legal effect, since we feel that the Government still agreed to deliver at least 50 percent of the estimate.

We find support for this view in the Uniform Commercial Code, which we have applied in the past. *See* Everett Plywood & Door Corp. v. United States, 419 F.2d 425, 190 Ct.Cl. 80 (1969). *Cf.* United States v. Wegematic Corp., 360 F.2d 674, 676 (2d Cir. 1966). Section 2–306(1) of the Code, which deals with output and requirements contracts, states that "no quantity unreasonably disproportionate to any stated estimate or in the absence of a stated estimate to any normal or otherwise comparable prior output or requirements may be tendered or demanded." Although we have little doubt that, under this provision, a tendered quantity amounting to only 1.7 percent of the estimated quantity would be "unreasonably disproportionate," we need not here rely on such a nebulous standard. As comment 3 to section 2–306 points out, the parties to an output contract may themselves determine in advance the permissible quantity variance by setting out minimum and maximum quantities. We think that the parties here have done so in the adjustment clause discussed above.

Plaintiff urges that we classify the contract here as a sale by the "lot." As such, it would come within subparagraph 2 of the guarantee clause, quoted above, which provides that where property is offered for sale by the lot, the Government guarantees delivery of at least 75 percent of the quantity estimated in the invitation, where that quantity is estimated at 25 units or more. Here, plaintiff says that the contract called for the sale of a "lot" of silver, estimated at 311,666.6666 troy ounces.

We have never undertaken to define a sale by the lot, and the contract here

offers no express definition. In its ordinary meaning, a lot consists of a number of items taken collectively as a unit. *See* Hitchcock v. United States, 36 F.Supp. 507, 510 (E.D.Mich.1940); Germain Fruit Co. v. J. K. Armsby Co., 153 Cal. 585, 96 P. 319 (1908). Thus, we would characterize such a sale as one involving a group of items for which the purchaser pays a lump-sum price for the entire group, and not a sale where, as here, the purchaser buys on a unit-price basis, paying only for the quantities actually delivered.

Under plaintiff's definition, every transaction in which the seller offers more than one unit might be characterized as a sale by the lot. We do not think that the Government had that definition in mind when it drafted the guarantee. Consequently, we hold that under the Adjustment for Variation in Quantity or Weight clause, taken together with the guarantee provision, the Government guaranteed to deliver a minimum quantity amounting to 50 percent of the quantity estimated in the invitation.

The defendant argues that our holding above is circumscribed by the Limitation on Government's Liability clause, which provides that its liability for damages is limited to refunding the amounts paid by plaintiff for the silver actually delivered. We have previously considered such a limitations clause in contracts involving the sale of surplus property and have refused to read it in the unlimited fashion urged by the defendant. Benjamin v. United States, 348 F. 2d 502, 516–517, 172 Ct.Cl. 118, 137–138 (1965); Freedman v. United States, 320 F.2d 359, 362–363, 366–367, 162 Ct.Cl. 390, 396–397, 402–403 (1963). In the latter case, we held that the limitation of liability clause should be construed to meet those instances in which (1) a need for the property develops after it has been declared surplus and offered for sale, or (2) a serious mistake, such as a grave discrepancy between the true value of the item and the amount of the bid, has been made. Accordingly, we

hold that the clause does not here curtail the damages remedy that is generally applicable to breaches of contract.

We have considered plaintiff's affidavits relating to damages. Since we find them insufficient to determine the amount of recovery, we remand the case to our trial commissioner for further proceedings.

## CONCLUSION

Defendant's motion for summary judgment is denied and plaintiff's cross-motion for summary judgment is granted. Plaintiff is entitled to recover the net profit it would have earned had the defendant delivered during the 34-month period of the contract a sufficient quantity of material to enable plaintiff to extract 50 percent of the total estimated quantity of raw silver as stated in the contract. Judgment is entered to that effect; the amount of the recovery is to be determined pursuant to Rule 131(c).