Littleton, Judges
delivered the opinion of the court.
The plaintiffs purchased; on June 24, 1946, from the San Antonio Regional Office of the War Assets Administration, 15 pumping stations with R-41' (four-cylinder) gasoline engines at a fixed and agreed price of $1,659 each. Before making this purchase plaintiffs had arranged to sell such equipment to one of their customers at a profit. Plaintiffs paid the full purchase priced for the equipment with its customer’s check and such equipment was shipped direct to the customer.
Likewise, on October 17, .1946,- plaintiffs purchased from the. Cincinnati Regional Office, of the War Assets Administration, three pumping stations equipped with Climax R-Al (four-cylinder engines) at a unit price of $1,659.
Sixty pumping stations, 36 with Buda JL-877 engines and 24 with Climax R-41 engines, were declared surplus property on August 28,1945, by the San Antonio Regional Office, and 24 pumping stations equipped with Climax Rr-41 engines were declared surplus on April 23, 1946, by the Cincinnati Regional Office of the War Assets. Administration.
Prior to and at the time the above mentioned sales were made the prices at which various items of surplus property were to be' sold were fixed and determined by the Regional Offices of the War Assets Administration (originally known as the War Assets Corporation).
All of the selling by the War Assets Administration was done in the Regional offices.. War Assets also had divisions in Washington which acted in an administrative and advisory capacity to the Regional offices. The “Internal Combustion, Hydraulic & Pneumatic” section of the “Machine Tools & Industrial Equipment” division administered the disposal of surplus internal .combustion engines. In the early stages of the surplus property disposal program all pricing was done by the Regional offices with Washington acting in a reviewing capacity only. Later, in the fall of 1946, the Washington office established Fixed Price Registers which were to.be followed by the Regional offices in fixing prices. The Regional office then, determined a price by applying a formula obtained from.the Fixed Price Register to *97 ■the manufacturer’s list price. The Washington office attempted to review the prices' established by the Regional offices but, owing to the lack of sufficient personnel to check each Regional listing and sale, the review was in effect limited to obvious mistakes in pricing, such as a misplaced decimal point.
The War Assets Administration, in order to facilitate the disposal of commodities, established “Customer’s Service Centers” in connection with each Regional office so that the availability of property in any particular region was made known to all other Regional offices and through the Customers Service Centers to prospective customers.
Mr. Grover C. Lucker, chief of the Internal Combustion, Hydraulic & Pneumatic section, War Assets Administration at Washington, was informed by letter dated February 21, 1946, and by telephone, that the San Antonio Regional Office had established the price of $1,659 to dealers for the Climax R-41 engine. Mr. Lucker made no objection to the price as established by the San Antonio Regional Office. Thereafter a catalog was issued by the San Antonio office listing the Climax R-41 engine and stating that the price was $1,659 to a dealer.
All the Climax R-41 engine pumping stations listed on the San Antonio surplus property declaration of August 28, 1945, were sold to various customers by that office at the price of $1,659 each.
By letter dated September 16, 1946, Mr. Lucker advised the director, of the War Assets Administration Regional Office in Cincinnati, Ohio, in regard to the Climax Ik-41 engines, listed on Sharonville Declaration, as follows:
We have established a selling price on the Climax engines, as equipped, at $1,659 each. If these cannot be absorbed promptly in your territory at this price, please advise this Section when they will be available and prospective purchasers can easily be referred to you.
Sometime subsequent to October 17, 1946, the plaintiffs learned, as set forth in findings 11-14, that another purchaser of surplus property pumping stations had acquired such equipment with Climax R6-1 (six cylinder) engines *98 from Minneapolis, Minnesota, Regional Office of the War Assets Administration, at a price of $1,562 per unit. Subsequently, the matter of the price of the pumping station equipment was taken up by plaintiffs and the Redistribution Service Company, who had also purchased surplus pumping stations through the Minneapolis Office, with Mr. Grover C. Lucker, Chief of the Internal Combustion, Hydraulic & Pneumatic Section, War Assets Administration in Washington, and Mr. Wilbert Wessels, Lucker’s assistant. Lucker and Wessels informed plaintiffs, as shown in findings 18 and 14, that the advice which the Customers Service Center of the War Assets Administration, in Washington, had given to the Redistribution Service Company to the effect, as shown in finding 11, that there were some Climax engine pumping stations available in the Cincinnati Region and that the price of such equipment was $1,659 per unit was in error, and that the correct price for this model Climax R-41 engines, in N-l condition, was $1,253.
Subsequently, Grover C. Lucker sent the telegram, quoted in finding 15, to the Cincinnati Regional Office on December 11, 1946. As a result of the action taken by Lucker, with reference to the price of surplus pumping stations, the plaintiffs filed a claim with the Cincinnati Regional Office on January 29, 1947, for a refund of $1,218, representing the difference between the price of $1,659 theretofore paid for three pumping stations, and a price of $1,253. The Cincinnati Regional Office allowed and paid the plaintiffs’ claim. The defendant’s first counterclaim is for the recovery of this refund on the ground that it was erroneously and illegally made.
The plaintiffs also, on January 29, 1947, filed a similar claim, as shown in finding 18, with the San Antonio Regional Office for a refund of $6,090. This claim was considered and denied by the San Antonio Office and by the War Assets Administration, in Washington. Finding 19. In this action plaintiffs seek to recover on this claim.
In our opinion the plaintiffs are not entitled to recover on their claim for the refund of $6,090. The price of the engines sold by the San Antonio Office was fixed by that office *99 and such office had the right at that time to fix the price at which it was willing to sell the equipment. The plaintiffs agreed to the unit price of $1,659 and made an offer to purchase at such price. That offer was accepted, the articles were delivered as ordered by plaintiffs and the full purchase price was paid by plaintiffs without question at the time. There was no mistake, mutual or otherwise. There was no guarantee against a future change or decline in price. There was, therefore, no factual or legal basis for the claim for refund filed with the San Antonio Regional Office by plaintiffs on January 29,1947. We think the War Assets Administration correctly denied the claim.
On the record, we think the defendant should not recover on its first counterclaim for the recovery of the amount of $1,218 refunded to plaintiffs by the Cincinnati Regional Office. Apparently, there was a misunderstanding between the Cincinnati Regional Office and the Chief of the Internal Combustion, Hydraulic & Pneumatic Section of the War Assets Administration in Washington, as to the price of pumping stations equipped with R-41 (four-cylinder) engines. The Cincinnati Office apparently thought that Lucker’s letter of September 16,1946, applied to all Climax engines, whether four-cylinder or six-cylinder and sold the pumping stations accordingly. Lucker’s telegram of December 11, 1946, explains that his letter of September 16 had reference to six-cylinder engines and not to four-cylinder •engines. The Cincinnati Office apparently relied upon Lucker’s letter of September 16, in fixing the price of $1,659. Although plaintiffs had purchased and paid for the pumping stations at that price, we cannot say, in the circumstances, that the Cincinnati Office and the War Assets Administration in Washington acted arbitrarily and without authority in allowing plaintiffs’ claim and in making the refund. If these authorized officials of the Administration concluded, as they apparently did, that they had made a mistake, there was nothing illegal in their action in correcting the mistake. The defendant’s proof is not sufficient to sustain its first •counterclaim for $1,218, and this counterclaim is denied.
*100 The defendant’s second counterclaim for $9,190.76 stands on a different footing. The facts with reference to this claim are set forth in findings 20 to 26, inclusive. The plaintiffs object to this counterclaim on the ground that the defendant on January 12,1948, after plaintiffs’ offer to purchase the 39 cabinet assemblies had been accepted, wrote plaintiffs that the cabinet assemblies had been sold to another buyer. Plaintiffs did not reply to. this letter which constituted a breach of the contract by anticipatory repudiation. However, the statement of repudiation was withdrawn by defendant in its letter to plaintiffs on January 12, 1948, before the plaintiffs changed their position in any way. Restatement, Contracts, Section 319. After receipt of defendant’s letter of January 12, finding 22, plaintiff elected by acquiescence to continue with the contract as originally agreed to by both parties. . Plaintiffs have offered no evidence to show that defendant’s letter of February 6 did not accurately state the understanding reached by both parties. Nor have plaintiffs offered any evidence to show that it changed its position between January 12 and February 6, or that it was damaged as a result of the erroneous notice of January 12,1948. On March 26 and 29,1948, the defendant delivered the control cabinet assemblies to plaintiffs’ place of business in Detroit, Michigan, the first lot of 22 cabinets being delivered on March 26, and the second lot of 17 cabinets being delivered on March 29. Finding 23. The record shows that these deliveries were received for plaintiffs by Walter J. Bolitho, one of the partners, and that he assisted the trucking company’s employees in unloading such cabinets at plaintiffs’ place of business. In these circumstances we think there was a valid and subsisting contract of sale of the control cabinets by defendant to plaintiffs, and that plaintiffs are liable to defendant for the agreed price thereof. Judgment will, therefore, be entered in favor of defendant on this counterclaim for $9,190.76, together with interest at the rate of six percent per annum from March 29,1948. It is so ordered.
Howell, Judge; Madden, Judge; Whitaker, Judge; and Jones, Chief Judge, concur.