Medwin **BENJAMIN**, d/b/a Benjamin's for Motors, Medwin Benjamin, d/b/a Mill Basin Repair Company, and Medwin Benjamin, Individually

v.

The **UNITED STATES**.

No. 538–52.

United States Court of Claims.
July 16, 1965.

I. H. Wachtel, Washington, D. C., for plaintiff. Jean J. Provost, Jr., Washington, D. C., of counsel.

James F. Merow, Washington, D. C., with whom was Asst. Atty. Gen. John W. Douglas, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS and COLLINS, Judges.

DAVIS, Judge:

In the years following the close of World War II, plaintiff's principal business was the purchase, restoration, and resale of new and used machinery. The War Assets Administration (WAA) and its predecessors sold him surplus government property having a value of three to four million dollars. This suit is one result of that activity. The petition contains 29 separate claims. Of these, 27 causes of action assert the defendant's failure to deliver certain machinery, the Government's misrepresentation of the condition of other equipment, or the furnishing of merchandise with missing parts. The major demands, however, are founded on (1) the alleged destruction of plaintiff's business by the Government when it levied execution on a government judgment against him (Cause of Action No. 29) and (2) the refusal of the defendant to allow dealer's discounts on part of the machinery plaintiff bought (Cause of Action No. 1). In view of

their pecuniary importance, we treat these claims first.

## CAUSE OF ACTION NO. 29

By late 1946, plaintiff owed WAA over $900,000 for war surplus property he had purchased. Stimulated by the concern of banks which had also extended credit to him, plaintiff sought to reach a settlement with WAA by offsetting claims he had in connection with the purchased goods against his admitted indebtedness. For the next four years, he, with the help of a succession of attorneys, negotiated unsuccessfully with representatives of the United States Attorney in the Eastern District of New York, the Claims (now Civil) Division of the Department of Justice, and the WAA (and, later, the General Services Administration (GSA)). Although plaintiff did volunteer at one point to place his entire inventory in escrow as security for the indebtedness, his highest monetary compromise offer was $325,000, while the defendant refused to accept less than $500,000.

On January 8, 1951, plaintiff and his lawyer attended a meeting in New York with officials of GSA, as successor of WAA, and the United States Attorney's office. The Assistant United States Attorney handling the case stated that his instructions were to file suit against plaintiff and to request the court to issue a warrant of attachment tying up plaintiff's property. Faced with this unhappy prospect, plaintiff capitulated, agreeing to confess judgment in the amount of the defendant's claim ($934,498), plus interest (a total of $1,137,787). At the close of the meeting, those present all signed a memorandum declaring, without qualification, that plaintiff had agreed to confess judgment, and that another conference would be held at the Department

of Justice on January 23, 1951, to discuss payment. The memorandum also stated that "if payment cannot be made or agreed upon, execution on the above-mentioned judgment will be levied. * * * [T]here will be no disposition or distribution of assets until the matter is further discussed on January 23, 1951." Mr. Benjamin signed a confession of judgment on the following day.

During the meeting on January 23rd at the Department of Justice, plaintiff said that he could make a down payment of no more than $15,000, followed by monthly payments of $5,000. The defendant's conferees rejected these proposed installment payments, suggesting instead that Mr. Benjamin pledge or mortgage his assets as security. Although plaintiff had remitted $10,000 by the time of the conference, he made no subsequent payments and advised the Assistant United States Attorney that he did not intend to post security for his debt. Unwilling to negotiate any further, the United States Attorney, on February 21, 1951, caused judgment to be entered against plaintiff on his confession and initiated supplementary proceedings in the United States District Court for the Eastern District of New York to discover the extent of Benjamin's assets. As a result of its investigation, the Government filed a motion requesting the appointment of a receiver. On August 9, 1951, the court granted that motion and denied plaintiff's cross-motion to stay execution of the judgment.[1] The receiver thereafter impounded and sold plaintiff's assets, receiving proceeds of $752,651 from which he transmitted $582,674 to the Government in payment of plaintiff's judgment.[2]

■ Plaintiff's claim against the Government for the destruction of his business is based on an alleged side-agree-

1. Previously, the District Court had denied, on July 17, 1951, plaintiff's motion to vacate the judgment entered on his confession. This denial was expressly stated to be with prejudice.

2. Almost the entire remainder was used to pay the receivership's expenses, the

major items being the fees of the receiver and his attorney. After discharging all its debts, the receivership has a cash balance of $9,543. The receiver's accounts have been approved by the United States District Court for the Eastern District of New York.

**509**
ment made contemporaneously with his confession of judgment. According to this purported understanding, plaintiff confessed judgment on the condition that the defendant would defer all enforcement proceedings until after the adjudication of his claims against the United States on the surplus property he had bought. At the trial of this case, plaintiff testified that he had entered into such an agreement at the meeting on January 8, 1951, but each of the other participants at that session categorically denied the existence of any understanding that the Government would postpone execution of the judgment. The trial commissioner recited this evidence but did not determine whether or not the parties had reached such an accord. His failure to make a finding in plaintiff's favor is suggestive but not conclusive.

In an effort to persuade the court to find such an oral agreement, plaintiff relies on the circumstances surrounding his confession of judgment as proof that an additional verbal agreement was in fact made. At the meeting on January 9, 1951, the day after he had agreed to confess judgment, plaintiff urged the Assistant United States Attorney to sign an acknowledgment that his confession was "made without prejudice and without waiving the rights of the Judgment Debtor to any and all such claims as [he] * * * has." Government's counsel refused, agreeing only to sign a statement that the confession would not be filed until after the January 23rd meeting at the Department of Justice. Two days later, plaintiff wrote the GSA regional counsel, affirming his "right to enforce any claims." The GSA reply on January 16th could not have been more explicit. Its letter stated, "[Y]ou are reminded that it was agreed during the conferences [of January 8th and 9th] that the confession was not contingent upon our adjustment of any claims asserted by you, but was merely a frank and voluntary confession by you of the fact that the demanded sum was the amount properly due and owing to the Government. * * * It was agreed, however, that separate and apart from the matter of your indebtedness to the United States, we would, in the normal course of business, administratively adjudicate any claims specified by you and that your confession of judgment would not bar you from the same consideration given to anyone asserting a claim against the General Services Administration." It is unclear whether plaintiff lodged any protest after receiving this letter.

These events following plaintiff's agreement to confess judgment reveal no more than his eagerness to continue processing his counterclaims and GSA's willingness to pass upon them; at the most, such circumstances may indicate that Mr. Benjamin supposed in his own mind that the parties had made an unrecorded side agreement. But this is not a case of "assurances" by government representatives "amount[ing] either to an outright promise or to a representation giving rise to an estoppel." Cf. George H. Whike Constr. Co. v. United States, 140 F.Supp. 560, 563, 135 Ct.Cl. 126, 130 (1956). Rather, the Government's consistent position during these exchanges was that it had an unqualified right to enforce the judgment, and its plain statements spelling out that view can hardly have misled the plaintiff. The testimony of the witnesses other than plaintiff is fully consistent with the documentary record.

Plaintiff counters with the argument that no businessman with his experience would have agreed to such an unqualified confession of judgment. The memorandum of January 8, 1951, cannot possibly reflect the full understanding of the parties, he urges, because, by its terms, the Government was to receive $934,498 plus interest and give him virtually nothing in return. The written agreement, however, was not as one-sided as plaintiff implies. Both before and after the events of 1951, plaintiff freely admitted that he was indebted to the United States in that amount. See finding 7; tr. 508, 516, 662, 667. Since he had no legal defense to an action by the Government, plaintiff may well have confessed judg-

ment in an effort to forestall, for a limited period, action by an increasingly impatient United States Attorney's office—hoping to resolve the entire dispute, or to obtain better terms, at the January 23rd conference at the Department of Justice. The plaintiff may well have been bargaining for some weeks' time in order to stave off an immediate attachment of his property. By upholding the agreement as written we are by no means construing it so as to confer all the benefits on one of the parties.[3] Cf. Padbloc Co. v. United States, 161 Ct.Cl. 369, 376–377 (1963). Plaintiff's testimony stands alone, rebutted not only by the testimony of the others, but also by the contemporaneous documents and circumstances. We therefore concur with the commissioner in refusing to find that there was any side-agreement to defer execution of the judgment until after the determination of plaintiff's off-sets. We hold, on the contrary, that plaintiff has failed to prove the existence of such an unrecorded understanding. It follows, of course, that the Government cannot be held liable for breach of an agreement it never made.

█ Assuming that plaintiff himself believed such an agreement to have been reached, we next consider whether this is a sufficient basis for holding that the district court judgment should have been set aside or left unenforced, and for awarding plaintiff damages for injury stemming from its enforcement. Relief from a valid judgment is granted only in very limited and unusual circumstances (e. g., duress exerted on the jury or court). See, generally, Restatement, Judgments §§ 118–27. We have been directed to no decision permitting a judgment to be set aside merely because of unilateral mistake. Plaintiff claims, however, that the rule is different with respect to confessions of judgment. Even if, as plaintiff suggests, "they are in effect contracts which are merely recorded by the courts," it cannot be said that the "contract" is void because there was no "meeting of the minds". As has been pointed out, the judgment correctly reflected the objective understanding of the parties, as borne out by contemporaneous evidence. The secret subjective intentions of one of the parties are not controlling and do not afford a mechanism for avoiding contractual obligations. Even if the consent judgment is regarded merely as a contract, there is no basis for deeming it reformed or modified.[4] The defendant had the right to levy and may not be held liable for the resulting destruction of plaintiff's business.

█ Plaintiff makes a number of subsidiary arguments to the effect that government representatives conspired to drive him out of business. He contends that throughout the protracted settlement negotiations, as well as after the confession, the defendant arbitrarily refused to give serious consideration to his claims; and that the Assistant United States Attorney improperly induced him to confess judgment by threatening to ask the district court to issue a warrant of attachment, when there were no grounds for such a request. Whatever

3. The discussion, infra, of the Government's counterclaims discloses another advantage accruing to plaintiff as a result of his confession of judgment. The February 21, 1951, judgment was for plaintiff's entire indebtedness to the United States as of that date, and the Government was barred from subsequently asserting claims for additional amounts owing at that time (including one debt of over $75,-000), but not counted in making up the sum for which judgment was confessed.

4. It goes without saying that we have no power to change the judgment, as a judgment, entered by the District Court for the Eastern District of New York. See Garfield Trust Co. v. United States, 160 Ct.Cl. 178, 312 F.2d 751, cert. denied, 373 U.S. 923, 83 S.Ct. 1524, 10 L.Ed.2d 422 (1963). That court has already refused to vacate the judgment (see footnote 1, supra). Our discussion of this point proceeds on the plaintiff's own assumption that the judgment reflects and embodies a contract with the defendant, and that we can deal with that contract as with other agreements made by private parties with the Government.

merit these contentions may have,[5] they would form the basis of a tort action, over which this court has no jurisdiction. E. g., Schillinger v. United States, 155 U.S. 163, 167–169, 15 S.Ct. 85, 39 L.Ed. 108 (1894); Locke v. United States, 283 F.2d 521, 525–526, 151 Ct.Cl. 262, 270, (1960). Cause of Action No. 29 must therefore be dismissed.

## CAUSE OF ACTION NO. 1

To expedite the disposal of war surplus property, WAA issued regulations allowing sales discounts on the basis of the distributive function performed by the buyer. Under that policy, the agency published a "Fixed Price Register", which listed the various types of merchandise offered for sale and established one set of purchase prices for dealers (i. e., wholesalers and retailers)[6] and a higher set for ultimate consumers.

Plaintiff was classed as a dealer. He alleges that, prior to May 1947, he received not only the dealer's price on all equipment he bought from WAA, but also a 15% "dealer's discount". After that date, it is asserted, the Government refused to give plaintiff the additional 15% dealer's discount. It is difficult to find any language in the regulation entitling him to a dual discount on all purchases. On the contrary, the rule is laid down that "discounts may be granted on the disposal of surplus property *only* (i) when different price levels are established in order to compensate for the services rendered in the distribution of property to the various levels of trade." (emphasis added.) Finding 29(b). That is the very purpose of the dealer's rates established in the "Fixed Price Register"; since compensation for the dealer's distributive function is accorded by the special rate, a supplemental discount appears to be prohibited.

The trial commissioner found that WAA followed a course of conduct entitling plaintiff to rely on receiving both the dealer's price and a 15% dealer's discount. Assuming that the regulation's prohibition of such additional allowances could properly be waived by WAA officials having the authority to do so, we must disagree with the commissioner's finding that this was done. The evidence, in our view, does not establish that plaintiff was permitted to buy merchandise at less than the dealer's price. The general policy of WAA seems to have been to permit only one discount on each sale, in the form of a dealer's price. See Zink v. United States, 123 Ct.Cl. 85, 87–89 (1952); Handler Motor Co. v. United States, 121 Ct.Cl. 845, 849–850, 862–863 (1952). The only documentary evidence offered by plaintiff to prove that he was treated differently is a group of invoices representing purchases made by him from WAA, which disclose a specific deduction equal to 15% of the sales price. We have no way of knowing, however, whether this amount was subtracted in order to arrive at the dealer's price, or whether it was in fact an additional discount. We do know, though, that a number of sales on which plaintiff now asks for an extra allowance were negotiated transactions in which plaintiff understood the amount of the discount received and agreed to the final price. In such circumstances, this court has refused to alter the terms of the parties' agreement. Zink v. United States, supra, 123 Ct.Cl. at 98–99. Moreover, a number of plaintiff's purchase orders prior to May 1947—when WAA's alleged change of position took place—reflect the receipt of only one discount and tend to show that plaintiff was perfectly content to buy at the dealer's price. Since he has offered such tenuous proof

---

5. The WAA did make at least some effort to resolve plaintiff's claims. See findings 40, 51, 55, 59, 68, 75–77, 82, 85, 89, 106, 118. Moreover, there may well have been sufficient grounds for the issuance of a warrant of attachment in January 1951 because of fear that plaintiff would otherwise dissipate his assets; this was one of the major reasons given by the district court for its appointment of a receiver six months later.

6. In some cases, wholesalers and retailers were given the same discount, while in other instances wholesalers were allowed larger discounts.

to show that WAA, in his case, abandoned the policy set forth in the regulations and which appears to have been generally followed by the agency, we conclude that he has failed to prove the right to any additional discounts.

## CAUSES OF ACTION NOS. 2–28 [7]

 *Causes of Action Nos. 2, 3, 8 and 9.*—These claims arise out of the sale to plaintiff, in 1946 and 1947, of four sets of identical Chrysler diesel engines. None of the engines came equipped with enclosing hoods, exhaust mufflers, or steel extension bases. Asserting that he spent $400 on each machine to supply the missing items and to repair defects, plaintiff demands reimbursement for these expenditures. In addition, recovery is requested for the defendant's alleged failure to deliver sixteen of the 82 units purchased in the fourth group (as well as for the repairs and replacement of parts missing from the merchandise contained in that shipment).

The first group of engines (Cause of Action No. 2) was purchased by plaintiff in May 1946 and received by him sometime in June of that year. The second set (Cause of Action No. 3) was shipped on July 30, 1946, and received shortly thereafter. Plaintiff's original petition in this court was filed on October 28, 1952, over six years after he received these items and was first able to discover any defects or missing parts. Since an action for breach of warranty would normally accrue at that time, the claims would appear to be barred by limitations. 28 U.S.C. § 2501; e. g., Empire Institute of Tailoring, Inc. v. United States, 161 F.Supp. 409, 142 Ct.Cl. 165 (1958). Plaintiff suggests that there was an open account between the parties, subject to a final balance in the future. Though the use of an open account would prevent the statute from running until completion of the last transaction contemplated, the record indicates that, in plaintiff's dealings with the Government, each purchase was treated separately. WAA repeatedly requested payment on individual transactions rather than the balance due on an "account". There was no agreement on, or practice of, a running account. Cf. Baggett Transp. Co. v. United States, Ct.Cl., 319 F.2d 864, 868–871, decided July 12, 1963. Again, although limitations would be stayed until after a final administrative determination of plaintiff's claims *if* one were mandatory, there was no such requirement here.[8] These were commonplace, garden variety, claims on surplus sales in which the parties' agreements established no contractual tribunal to resolve legal or factual disputes. Suit could be brought in ordinary course, without waiting for prior administrative consideration or settlement. See Friedman v. United States, 159 Ct.Cl. 1, 7–13, 310 F.2d 381, 384–388 (1962), cert. denied, Lipp v. United States, 373 U.S. 932, 83 S.Ct. 1540 (1963). Nor did the confession of judgment result in the accrual of new causes of action with respect to these claims. Though the *quid*

---

7. These causes of action will be discussed in numerical order, omitting certain claims asserted in plaintiff's petition. At the trial, plaintiff withdrew his 12th, 16th, and 28th causes of action. The defendant conceded plaintiff's entitlement to $168.75 on his 21st claim, and plaintiff accepted that concession. As to Causes of Action Nos. 6, 7, and 10, plaintiff has not taken any exception to the trial commissioner's findings rejecting his claims. The court adopts these findings.

8. Claiming that he was misled in this respect, plaintiff relies on Akol, et al. (Mandigo) v. United States, Ct.Cl., decided May 15, 1964, and Akol, et al. (Stanford) v. United States, Ct.Cl., decided April 17, 1964, 330 F.2d 618, to support his contention that such misleading advice by government representatives will prevent the statute from running. Those cases, however, involved retired servicemen upon whom were conferred new rights under a special provision of one statute, the Career Compensation Act of 1949, 63 Stat. 802, 37 U.S.C. § 231. No general rule of the type advocated by plaintiff was laid down. Moreover, we cannot see that defendant's officials misled him into believing that suit would be precluded until the completion of administrative proceedings.

*pro quo* for plaintiff's confession may have been the Government's acknowledgment of his right to assert the present claims, the defendant did not, at the same time, agree to give up any of its possible defenses, one of which was the statute of limitations. There is no basis for deferring the accrual of Causes of Action Nos. 2 and 3 beyond the date of delivery of the goods, and we therefore must hold the claims barred.

■ The sales agreement for the third set of engines (Cause of Action No. 8) included a disclaimer of all warranties except as to title and as to the accuracy of the description of the merchandise. Unlike the previous sales, the invoice contained no representation that the equipment was in "N1" condition (unused; excellent). But the absence of that warranty does not really bear on plaintiff's claim, as far as it relates to missing parts. If a Chrysler diesel engine normally included the parts that were allegedly missing, plaintiff did not receive the equipment as described in the sales document. Mr. Benjamin, in his testimony at the trial, characterized these parts as "missing" on numerous occasions, thus strongly implying that the engines generally came equipped with such items as enclosing hoods, exhaust mufflers, and steel extension bases. He also explained that the engines "would not work too well" without the missing parts. Plaintiff thereby sustained his burden of showing that the equipment supplied did not conform to the description in the sales agreement.

■ The only evidence offered by the Government on this point is the administrative ruling of WAA denying re-lief to plaintiff. The agency grounded its determination on information allegedly received from the Chrysler Company that the equipment was not manufactured with the parts claimed to be missing. We cannot accept that bare decision as competent proof of the truth of the manufacturer's alleged statement; the recitation in that document is clearly hearsay, to the admission of which plaintiff strenuously objected. Tr. 1183–84, 1669.[9] Thus, no proper evidence has been offered to rebut plaintiff's proof that these items were normally sold as part of the diesel engines.[10]

■ The defendant contends that recovery is nonetheless precluded by the doctrine of *res judicata*. The merchandise with which we are now concerned was included in the district court judgment against plaintiff for his total indebtedness to the United States. The defendant argues that the present cause of action is barred because it was a compulsory counterclaim or offset (within Rule 13(a) of the Federal Rules of Civil Procedure) which Mr. Benjamin was required to assert before the district court. This contention ignores the actual understanding of the parties, and of the court, at the time plaintiff confessed judgment. The district judge, in his opinion denying plaintiff's motion to stay execution of the judgment, stated specifically that "he still has his right to prove his offset." The contemporaneous depositions of the parties confirm that understanding. Defendant now urges that plaintiff's right to offset the judgment was limited to proceedings before the GSA, but the parties' agreement in no way intimates that that agency was to be plaintiff's sole recourse. His unqualified right

---

9. Although plaintiff did not specifically incorporate that objection in his briefs to the court, it is implicit in his entire line of argument on this phase of the case. Were we to conclude that the engines were not manufactured with the parts claimed to be missing, plaintiff would obviously not be able to recover. See Cause of Action No. 5, *infra*.

10. Even though plaintiff had previously bought and received identical engines, he did not necessarily have knowledge, at the time of the present purchase, that the parts were not included. There is no showing that he had, by then, examined the earlier equipment. That plaintiff did not lodge any "missing-parts" complaint until after the present transaction indicates the contrary, as does the fact that he paid more for these units than for the previous ones.

to show his offsets or counterclaims was repeatedly asserted, and that right normally includes the right of access to the courts. It is also said that, assuming that court scrutiny was permitted by the agreement, the district court rendering the original judgment against Benjamin was the only proper forum. The defendant's suggestion that Rule 60(b) of the Federal Rules of Civil Procedure (dealing with relief from judgment due to mistake, inadvertence, etc.) would be the vehicle for determination of plaintiff's claims does not convince us that the district court was ever available for that purpose. It surely cannot have been the intention of the parties to enable plaintiff to secure judicial relief only through invoking a procedural rule for correcting inadvertence (and the like), when in fact there was none. An ordinary suit in this court, or in the district courts under the Tucker Act, would still be available. For these reasons, plaintiff's right to pursue this and the subsequent causes of action is not barred by the defense of *res judicata*.

Plaintiff claims entitlement to $5,200 (or $400 per engine) as the cost of repairing the thirteen diesel engines (in Cause of Action No. 8) and replacing their missing parts. Since no description of the condition of the equipment ("N1" or otherwise) was included in the sales agreement, the disclaimer of everything except title and description precludes recovery for *repair* expenditures (as distinguished from replacement of missing parts). Although plaintiff has made no effort to segregate the two types of expenses, his requests for reimbursement in 1947 and 1951 included only $250 per engine (a total of $3,-250) for missing parts replacement, which was found by the trial commissioner to be the appropriate measure of damages. We accept this finding and grant recovery of $3,250.

Plaintiff made the final purchase of 82 engines in February 1947 (Cause of Action No. 9). By that time, he had already discovered the parts missing from the previously delivered equipment and lodged a complaint in that regard. See finding 37. Possibly, it was his accentuation of these deficiencies that enabled Mr. Benjamin to buy this last group of diesels for only $689 apiece, rather than the prices in excess of $800 which WAA had received in the prior sales. Since he knew exactly what he was getting, plaintiff has no claim for breach of warranty. See Helene Curtis Industries, Inc. v. United States, 312 F.2d 774, 779, 160 Ct.Cl. 437, 445 (1963).

Plaintiff also contends that the Government failed to deliver sixteen of the 82 engines ordered. The only supporting evidence offered was (1) the sales document, which contained an ambiguous handwritten notation that 66 engines were received, and (2) a letter from one of plaintiff's employees to WAA, stating that sixteen engines were not delivered. That employee did not take the stand, and plaintiff, the only witness testifying on this matter, disclaimed any personal knowledge. On the basis of this scant evidence, we conclude that plaintiff has not borne his burden of proof on the nondelivery claim.

On these four claims, plaintiff's recovery is limited to $3,250 under Cause of Action No. 8.

*Cause of Action No. 4.*—In December 1946, WAA sold a generator set to plaintiff for $3,230. Although its description and serial number were included in the sales document, the agreement did not state whether the equipment was new. Shortly after receiving the merchandise (which bore the correct serial number), plaintiff requested "an adequate allowance" from WAA, because he had expected a new generator and instead received a used one. The agency having denied his claim, plaintiff asks damages of $1,615 as the difference in value.

According to plaintiff, the generator set was purchased on the basis of the government catalog's representation that such equipment was unused. This contention is based solely on plaintiff's tes-

timony to that effect, which he himself had contradicted earlier in the trial. Tr. 130, 143. The catalog, which offered the best possible proof, was never submitted in evidence. Plaintiff has failed to substantiate his claim that this was a catalog sale.

The only other possible ground for permitting recovery is plaintiff's testimony that he had bought hundreds of these generators from WAA, paying approximately $3,200 for those which were new and $1,600 for used ones. The sales agreement, however, contained no suggestion that the equipment was unused, and plaintiff does not contend that WAA sales personnel made any oral representations to that effect. In such circumstances, the court may revise the agreement to reflect plaintiff's subjective understanding only if it finds that the defendant should reasonably have known that plaintiff would not agree to buy a used generator at that price. Cf. Wender Presses, Inc. v. United States, Ct.Cl., 343 F.2d 961, decided April 16, 1965; Allied Contractors, Inc. v. United States, 159 Ct.Cl. 548, 310 F.2d 945 (1962). Although plaintiff may generally have purchased new and used generator sets at the prices he gave in his testimony, he has not shown that the amount offered by him in this instance was so out-of-the-ordinary as to put the defendant on notice and entitle him to recover the difference.

■ *Cause of Action No. 5.*—After purchasing 155 Delco generators in "N1" condition, plaintiff discovered, when the shipment arrived, that they were not equipped with gas tanks, mufflers, tools, or spare parts. As in Cause of Action No. 8, supra, the Government's main defense is the manufacturer's statement that the equipment was not made with the parts allegedly "missing". In this instance, however, instead of merely submitting in evidence the GSA ruling denying the claim, the defendant offered the letter actually received from Delco,

and plaintiff made no objection to its admission. On the other hand, Mr. Benjamin testified that he had examined a sample Delco generator at a special offering by WAA immediately prior to the present sale, and noted that it included each of the items subsequently determined to be omitted from the machines he bought. Faced with the manufacturer's contrary assertion, we believe that plaintiff must have been mistaken.[11] Plaintiff's claim is denied because, on this record, he has missed proving that, as an experienced buyer and seller of such merchandise, he should not reasonably have known (or discovered) that the generators were manufactured without these parts. Cf. Dulien Steel Products, Inc. v. United States, 143 Ct.Cl. 484, 494 (1958).

■ *Cause of Action No. 11.*—In February 1947, plaintiff purchased ten generators, of which three were warranted to be in "N1" condition (new and in excellent condition), and seven as "E2" (used, but reconditioned and in good working order). When plaintiff received these machines, he discovered that only one of the ten met its warranty. A WAA representative investigating plaintiff's claim substantially confirmed his contentions as to the state of the generators. As a result, in May 1948 the agency offered to refund the purchase price plus freight charges of redelivery, if plaintiff would return the nine defective generators. The trial commissioner found that plaintiff was apparently unsatisfied with this proposal and unwilling to reship the goods, even after WAA, on numerous occasions, had advised him to follow this course of action. Although Mr. Benjamin now suggests that he advised the agency to transport the generators itself and that the agency refused, the record amply supports the commissioner's determination that it was plaintiff who prevented redelivery. See finding 69 and defendant's Exhibits 86, 87, and 88. The WAA can hardly be

---

11. The trial commissioner reported plaintiff's testimony in this regard, without

reaching any conclusion as to its accuracy.

held to blame for plaintiff's intransigence.

Plaintiff nevertheless contends that he is entitled, not only to the purchase price, but also to the additional amount he lost by not being able to resell "N1" and "E2" generators. This equipment, it is urged, was taken by the receivership in August 1951 along with plaintiff's other assets and, in that manner, "redelivered" to the defendant. Even if the measure of damages asserted by plaintiff is proper, the factual premise on which his argument is based is unsupported in this record. There is no evidence, documentary or otherwise, to indicate that the nine generators purchased in 1947 were still among plaintiff's assets when they were seized by the receiver four years later. The trial commissioner concluded that plaintiff reneged when WAA offered a full refund of the purchase price because he knew he could receive more by reselling the defective generators. Plaintiff has offered the court no adequate basis for setting aside the commissioner's finding that he resold this equipment sometime in 1948. See finding 70. He is not entitled to the full purchase price.

■■■ By rejecting the Government's offer to rescind the sale and refund the purchase price, did plaintiff completely forfeit his right to all damages? Ordinarily, plaintiff would remain entitled to the difference between the market value of the generators if they had been in the condition warranted and their actual market value. McCormick, Damages § 176 (1935); 5 Williston, Contracts § 1391 (rev. ed. 1937); e. g., Beer v. United States, 100 F.Supp. 808, 810, 120 Ct.Cl. 690, 702, (1951).[12] We do not think that that result was altered by inclusion in the sales agreement of a provision that "seller's liability * * * shall not exceed amount of purchase price." See findings 67, 35(c). As we pointed out in another case involving the sale of surplus property under a contract containing a similar limitation, "To read the clause in [an] unlimited fashion —excusing all damages for any type of breach—would come close to (if not reach) the pit of voidness; the Government would in effect promise nothing although the other party would supposedly be bound." Freedman v. United States, Ct.Cl., 320 F.2d 359, 366, decided July 12, 1963, (footnote omitted). To avoid that consequence, we suggested that the clause be construed in accordance with its purpose, i. e. "to meet those instances in which (1) a need for the property develops after it has been declared surplus and offered for sale, or (2) a serious mistake has been made, such as a grave price discrepancy between the true value of the item and the amount bid." 320 F.2d at 362. The second category referred to cases (such as Freedman itself) where the Government sells merchandise at a price far below its true value, because unaware of its actual worth. It does not include sales in which the Government warrants goods to be of a certain quality and instead delivers inferior items. The clause protects the defendant against mistakenly selling gold at the going price for brass, and furnishes assurance that the vendee will not thus fall heir to a windfall. But this clause, alone, does not effectively exempt the Government from liability for breach of warranty; if that is to be done, it should be by explicit disclaimer of the kind often used in surplus disposals. Cf. Montreal Securities, Inc. v. United States, Ct.Cl., 329 F.2d 956, decided March 13, 1964, cert. denied, 379 U.S. 826, 85 S.Ct. 53, 13 L.Ed.2d 36; Alloys & Chemical Corp. v. United States, Ct.Cl., 324 F.2d 509, decided Nov. 15, 1963. This interpretation of the liability-limitation clause accords with the dominant purpose of the damages rem-

12. The disclaimers did not cover the accuracy of the defendant's title or its description of the property. Similarly, the provision for "final" "adjustments" by the War Assets Administrator "in his sole discretion" (see finding 35(c)) did not govern breaches of warranty of title or description. The warranty of description is involved here.

edy—to place the party against whom the breach was committed in the position he would have held had the contract been fully performed according to its terms. Cf. Acme Equipment Process Co. v. United States, Ct.Cl., 347 F.2d 509, decided June 11, 1965. That normal goal should not be obstructed without explicit authorization in the contract. We conclude, therefore, that plaintiff may recover, under the accepted standard of damages, for failure of the generators to conform to their warranty of description.

Since plaintiff attempted to demonstrate a larger amount of damages and had no occasion at the original trial to submit proof in accordance with this appropriate measure, he may do so, if he desires, in a subsequent proceeding before the commissioner under Rule 47 (c).[13]

*Causes of Action Nos. 13, 19, and 25.*— The first of these claims (No. 13) involves forty propelling units sold to plaintiff in February 1947 by WAA's Birmingham office. During the next six weeks, but before inspecting the merchandise, plaintiff bought 250 identical units from the Memphis office, and they form the basis for claims 19 and 25. Although this equipment was warranted to be in "N1" (new; excellent) or "N2" (new; good) condition, the shipment arriving from Birmingham was partially rusted (but unused). Plaintiff, after making this discovery, immediately wired the Memphis office, directing it to cancel shipment of the propelling units previously ordered because similar items received from another WAA branch were not "new". After several written exchanges, the Memphis office reluctantly acquiesced, crediting plaintiff's account for the full purchase price.

In Cause of Action No. 13, plaintiff asserts that he expended $7,000 in making necessary repairs on each of the forty units he received ($175 per unit). By this rehabilitation, he was able to resell each machine for $1,000, although, according to his testimony, the normal price of propelling units meeting the "N1" or "N2" description was $1,500. In addition to the $7,000 repair cost, plaintiff also seeks damages of $20,000 (or $500 per unit, derived by subtracting $1,000 from $1,500), for breach of warranty. The sales agreement in each of these instances (finding 35(c)) disclaimed all warranties, except as to title and as to "the accuracy of the description of the property, provided however, that if the property is described as new, seller warrants only that it has not been used." The defendant contends that, under this proviso, the "N1" and "N2" warranties were entirely satisfied through delivery of admittedly unused propelling units (even though rusted). We think not. The proviso makes it clear that the "N" designation warrants only that the equipment is unused (rather than new in the sense of "brand new" as distinguished from unused but old or out-of-date). That clause does not, however, bear on the meaning of "1" and "2", which were well-known code references signifying that the units were in "excellent" or "good" condition. See Beer v. United States, 100 F.Supp. 808, 120 Ct. Cl. 690, 692–693 (1951). The present case is thus unlike Handler Motor Co. v. United States, 121 Ct.Cl. 845 (1952), where the sales agreement stated only that the merchandise was new, and made no representation as to its condition. Moreover, the plaintiffs in Handler knew or reasonably should have known of the defects subsequently encountered. Since Mr. Benjamin had no reason to suspect that these units were corroded and failed to meet the standards of quality ("1" and "2") warranted in the sales agreement, he is entitled to recover the $7,000 expended in making necessary repairs.[14]

---

13. Under our holding on defendant's counterclaim, infra, the amount arrived at in such a proceeding would in effect serve only to reduce the district court judgment against plaintiff.

14. In subsequent causes of action, defendant has also asserted that an "N1" or "N2" warranty is satisfied by the delivery of unused (though defective) merchandise. The Government's contention must

Though the agreement contained a provision limiting damages to the purchase price, for the reasons given in Cause of Action No. 11, supra, plaintiff may also receive credit for $20,000, which he lost by not being able to resell goods conforming to the warranty.

On the other hand, when plaintiff canceled the remaining two purchases from the Memphis branch (Causes of Action Nos. 19 and 25), he could not possibly have known that these propelling units would also fail to meet the warranty. The delivery of deficient items from the Birmingham office does not support the inference that all such equipment sold by WAA was inferior, even though it came from a different branch (and, presumably, a separate warehouse). In fact, the agency wrote plaintiff that, "We do not believe the basis for your action in cancelling this purchase * * * is justified, especially since a representative of your firm made a preinspection of the units * * *. We have sold and delivered a number of these units and the purchasers are completely satisfied with them." In the first instance, then, it was plaintiff rather than the Government who breached these two contracts. But when WAA finally agreed to accept plaintiff's cancellation, the parties effected a mutual rescission.

In sum, plaintiff's recovery on Cause of Action No. 13 is $27,000, and Nos. 19 and 25 must be rejected.

*Cause of Action No. 14.*—Plaintiff bought 696 Hobart generators in March 1947, agreeing to pay $50 each. The sales agreement described the units as "Model 5J", manufactured by "The Hobart Bros. Co." Immediately after receiving these generators, plaintiff wired WAA that he did not want them because they were single—rather than two-bearing. After unsuccessfully attempting to arrive at an adjusted price, the agency denied plaintiff's claim. Plaintiff implies

that he was misled when the WAA, in drafting the sales agreement, "carefully failed to disclose" the number of bearings. But the evidence indicates that it never occurred to agency representatives that plaintiff thought he was buying two-bearing generators; instead, they felt he had made a "fair offer". See finding 81. The same evidence shows that the price offered by the plaintiff did not put WAA on notice as to the misunderstanding. The result is not, as plaintiff argues, a lack of mutuality rendering the agreement void; rather, under the objective theory of contracts, we must disregard Mr. Benjamin's undisclosed and unknown subjective understanding and give effect to the written contract into which the parties actually entered.

Plaintiff contends in the alternative that the agreement's designation of the units as "Model 5J" amounted to a guarantee that the generators were double-bearing. He claims that a letter from the manufacturer supports his position, but the gist of the manufacturer's letter is that the symbol "5J" indicates that the generators could be *either* single-bearing or two-bearing. See finding 82. Cause of Action No. 14 must therefore be denied.

*Cause of Action No. 15.*—The major claim presented here is another instance of equipment received by plaintiff which allegedly failed to comply with the warranty contained in the sales document—the 476 dough-mixing machines purchased in March 1947 were guaranteed to be unused, but of the 468 delivered all except seven were worn by use. Once again, WAA offered to refund the purchase price plus freight expenses, but plaintiff refused. Although plaintiff still claims entitlement to the purchase price on the ground that these machines were among the assets seized by the receiver, his self-serving testimony is insufficient to prove that assertion.[15]

be rejected with regard to those claims as well.

15. The only additional evidence tendered by plaintiff on this issue is a claim he filed

with GSA on August 24, 1951, stating, "The merchandise * * * is still in the possession of claimant and has been held by claimant because of the failure of the Government to issue shipping in-

■■ The issue of breach of warranty remains. The Government contends that this case is distinguishable from Cause of Action No. 11, supra, and that plaintiff may not recover on the warranty because the present sales agreement contained the disclaimer, "Material sold as is, FOB location". Along with that disclaimer, however, the agreement specifically described the equipment as "unused" and contained a warranty as to the accuracy of the description. We think that the attenuated general disclaimer—"material sold as is"—was insufficient to overcome the specific description and the specific warranty of its accuracy, on both of which plaintiff is entitled to rely. Cf. Krupp v. Federal Housing Administration, 285 F.2d 833 (C.A.1, 1961).[16] As in Cause of Action No. 11, supra, plaintiff is entitled to the benefit of his bargain; he may recover the difference between the value of the 468 machines had they come as warranted and their actual market value. Although plaintiff implies that the proper measure is the difference between the price he paid for the goods and their resale market value, that is strictly true only with respect to the eight units plaintiff never received; he had no opportunity to resell these units and thus reduce his loss of $1,448.40 (i. e., the resale market value of eight unused machines less the purchase price). But the defendant is likewise incorrect in intimating that plaintiff's uncontradicted testimony as to the market value of unused dough-mixing machines is insufficient prima facie proof of such value. In the absence of any rebuttal evidence by the Government, plaintiff need show, in further proceedings, only the market value of the 461 used machines he received.

In this cause of action, plaintiff also requests reimbursement of the price he paid for seven used dough-mixing machines, which were purchased at the same time but never delivered. The commissioner has found, however, that Mr. Benjamin received a credit for that amount, and the finding is suported by the record.

Plaintiff is entitled to damages of $1,448.40 resulting from the nondelivery of eight unused dough-mixing machines. With regard to the 461 units which were received in used condition, he may, if he wishes, prove his damages in proceedings before the trial commissioner under Rule 47(c). His claim relating to the seven used pieces which came as warranted is dismissed.

■ *Cause of Action No. 17.*—Of the four "N2" compressors purchased by plaintiff in March 1947, only one came in the condition represented. Two were badly dented, and the third one was used. Shortly thereafter, plaintiff filed a claim for $2,500 as his estimate of the cost of repairing the three defective machines so that they would substantially conform with the warranty. In at least five letters over the next fifteen months, plaintiff renewed his claim and requested that it be given immediate attention. In July 1948, WAA offered him an adjustment of $907, based on a report filed by one of its investigators who had inspected the damaged equipment. In addition to these conflicting contemporaneous estimates, there is plaintiff's testimony at the trial (in 1956) that it ultimately cost $2,500 to repair only two of the compressors and that the third one had to be discarded as worthless. We think, after

structions during the past four years." The trial commissioner made no finding as to the accuracy of this representation. It cannot be given much weight if we take into account that (1) the commissioner recommended denial of recovery on this claim, (2) the receiver had been appointed two weeks before the statement was made, and (3) plaintiff submitted no documentary evidence that the merchandise was taken by the receiver.

16. The present case is unlike Ships & Power, Inc. v. United States, 160 Ct. Cl. 769 (1963), dismissed by order, which involved a corporation managed by plaintiff. In that case, the disclaimer was considerably more extensive, and there was evidence indicating that plaintiff knew or reasonably should have known of the deficiencies of the property.

taking into account the parties' contemporaneous evaluations of the defects, as well as the trial commissioner's finding that plaintiff should receive approximately that amount,[17] that plaintiff is entitled to $2,500 on this claim.

■■■■ *Causes of Action Nos. 18 and 22.*—Two diesel engines purchased by plaintiff in February 1947 were never delivered, and he sues to recover $989.90, which the Government concedes he lost as a result of its failure to carry out the agreement (Cause of Action No. 18). The defendant relies on a provision in the sales document limiting liability to the purchase price. As we pointed out in Freedman v. United States, supra, Ct. Cl., 320 F.2d 359, 362, decided July 12, 1963, that limitation is generally applicable where the Government discovers it needs the property offered for sale, or where the sale price is considerably below the value of the merchandise. It is now said that the two engines were withdrawn from sale because of military needs, and that liability is therefore restricted to the purchase price which has already been returned to plaintiff. But the only material offered in support of this allegation is a letter from WAA to plaintiff, asserting that the military agency which owned the equipment had discovered that it was still needed. Although the letter was submitted by plaintiff as part of a series of exhibits, such letters were admitted only for the purpose of proving that the correspondence had taken place, and not to prove the truth of the statements contained in any of the letters. Admission of the entire series for even this limited purpose was objected to at the time by government counsel. See Tr. 59–64, 86–87, 117, 135–36, 170–71. The "evidence" on which de-

fendant relies is thus without probative value. Since the Government has failed to prove that the purchase-price limitation was applicable here, plaintiff may recover damages of $989.90.

■■■■ In Cause of Action No. 22, plaintiff purchased twenty-five 75-horsepower motors from WAA for $6,300. This equipment, also, was never delivered by the agency, apparently because it discovered that the motors on hand were only 7.5 horsepower. Although the Government undeniably made a material error in its offer, the error was wholly in the Government's favor; it did in fact intend to offer and sell 75-horsepower motors at the negotiated price.[18] If the motors had been delivered, plaintiff could have sued for breach of the warranty of description, and the proviso limiting liability to the purchase price would have been unavailing. Refusal to deliver places the defendant in no better position. As proof of the market value of 75-horsepower motors, plaintiff testified that he had already contracted to resell the purchased units to Dow Chemical Company for $31,250. Since the defendant has not contested this estimate of the market value, plaintiff is entitled to $24,950, the difference between that amount and the purchase price.

*Cause of Action No. 20.*—This claim involves two motors purchased on July 8, 1946, over six years prior to the filing of plaintiff's petition in this court. As was pointed out in the discussion of Causes of Action Nos. 2 and 3, supra, such claims are barred by the statute of limitations.

■■■■ *Cause of Action No. 23.*—Plaintiff purchased 7,553 diesel-engine starting motors in February 1948, but the shipment of these units included only

17. The commissioner concluded that Mr. Benjamin was entitled to receive $2,595, comprised of (1) the full purchase price of the compressor allegedly beyond repair ($2,295) and (2) the commissioner's approximation of the cost of reconditioning the other two machines ($300).

18. In Freedman v. United States, the "serious mistake" and "grave price dis-

crepancy" to which the court referred were, in the main, mistakes and discrepancies adverse to the Government's interests (not to the purchaser's). Otherwise, the limitations proviso would expand, contrary to the court's holding in that case, to cover almost all breaches by the defendant, especially violations of warranties of description.

7,201 boxes. Plaintiff seeks damages for the alleged nondelivery of 352 units. The Government contends that there was no shortage, since a number of the boxes contained more than one motor. Plaintiff's testimony in this regard was somewhat contradictory. His main defense is that, after opening 25 crates containing one motor each, he presumed that every box had only a single motor in it and notified the defendant of the shortage. At this point, it is urged, the Government had a duty to tell plaintiff that two motors were included in some of the boxes. Instead, WAA simply rejected plaintiff's claim on the ground that there was no shortage, and he sold the entire shipment on the basis of 7,201 items. He has submitted no evidence as to the date of resale. It is clear that if Mr. Benjamin resold the motors (in the form he did) before WAA acted on his claim, the misunderstanding is his own fault. If the resale took place afterwards, the situation is that, by denying his claim, the agency had informed plaintiff of its belief that he had received the number to which the parties agreed. Plaintiff was put on notice to inquire further. When he thereafter resold the merchandise before fully ascertaining the facts, he acted negligently and must bear any resulting injury. By showing only that 25 of the boxes contained one motor each, plaintiff has failed to sustain his burden of proving either a shortage or that the defendant is to blame for the loss.

 *Causes of Action Nos. 24, 26, and 27.*—These claims involve similar issues relating to the nondelivery of equipment. In the first, the sales agreement under which plaintiff purchased two generators in February 1947 contained the provision, "Offered property subject to prior sale or withdrawal, prior to delivery to purchaser, without notice." Like the clause limiting liability to the purchase price, this provision does not enable the Government to cancel the agreement at its pleasure, on any ground. Rather, we think this clause was primarily intended to permit the defendant to cancel a sale if it discovered that the merchandise had already been sold prior to execution of the agreement or that it should not be sold at all. That has not been shown to be the case here. Some five months after the agreement was signed, a letter from WAA informed plaintiff that "this property cannot be shipped due to non-availability." Since the letter was admitted only to show the existence of the correspondence and not the truth of its contents (which were hearsay), the Government has failed to prove that the generators were in fact previously sold to another party or had been withdrawn from sale. Nor has the defendant shown that this is a case in which the agreement's limitation of damages to the purchase price is applicable. Plaintiff may recover $602, which the defendant concedes he lost by not being able to resell the generators.

 Claim No. 26 concerns the nondelivery of six generators, for which plaintiff agreed to pay $2,477.34, with a resale value of $12,000. The sales agreement restricted liability to the price paid for the equipment, but no clause concerning "prior sale or withdrawal" was included. The sole reason given by the defendant for its failure to supply this equipment was "unavailability." Plaintiff is therefore entitled to the benefit of his bargain, or $9,522.66.

 In Cause of Action No 27, WAA agreed to sell plaintiff 25 engines in "N2" condition, but later withheld delivery when it discovered that they were reconditioned rather than unused. Although plaintiff asserts he is entitled to recover the purchase price, he has failed to prove that he ever paid for this equipment or that it was included in the district court judgment. Nor has plaintiff carried his burden of proving damages stemming from the Government's failure to deliver the engines. See findings 118-21.

## DEFENDANT'S COUNTERCLAIMS

 The Government has filed two counterclaims. The first seeks to recover $75,255, for which plaintiff is allegedly indebted to the Maritime Ad-

ministration of the Department of Commerce. Since plaintiff neglected to submit responsive pleadings to this counterclaim as was required (Rule 10(a)), and the allegations are therefore to be deemed admitted (Rule 19(c)), the defendant claims automatic entitlement to an affirmative judgment of $75,255, less the amounts awarded plaintiff under the previous causes of action. Although we emphasized the importance of these rules in Alloy Products Corp. v. United States, 157 Ct.Cl. 376, 381–383, 302 F.2d 528, 531–32 (1962), the conclusion defendant draws from their application to this case is not a necessary one. Plaintiff admits the truth of the factual averments contained in the counterclaim (i. e. that he did owe the stipulated amount to the Maritime Administration), but contends that assertion of the claim at this time is nonetheless precluded by the *legal* defense of *res judicata*. Since plaintiff's 1951 confession of judgment "in favor of the United States" was for the "balance due and owing for goods sold and delivered to [him]", he urges that the present counterclaim involving a pre-1951 debt is barred as a split cause of action. As the Government has pointed out in its own argument that the district court judgment forecloses plaintiff's individual claims (an argument we have rejected above), all the evidence necessary to raise this issue was submitted at the trial of the case. The district court judgment and the related papers are part of the record. Since the defendant itself asserted *res judicata* in another context, it was aware of the existence of that type of defense and should not claim surprise. The equitable rationale underlying Rule 22(b) ("Amendments to Conform to the Evidence") dictates that plaintiff be allowed to amend his pleadings to assert *res judicata*. Cf. Erickson v. United States, 159 Ct.Cl. 202, 209–210, 309 F.2d 760, 764 (1962). It follows that, since the subject matter of the Government's first counterclaim should clearly have been included in its action against plaintiff in 1951, its present claim must be denied. See Restatement, Judgments § 62.

■ The Government's second counterclaim is "in the nature of a set-off". Because a considerable portion of the 1951 judgment against plaintiff remains unpaid, the defendant urges that that indebtedness bars recovery here. Since we have already concluded that there is no basis for disregarding the district court judgment at this time, the set-off must be granted. The evidence before the court indicates that the receivership has paid a total of $582,674 into the district court on the $1,137,787 judgment. The amount of plaintiff's damages, including any received as a result of subsequent proceedings before the trial commissioner under Rule 47(c), will be far less than his present debt to the Government. Mr. Benjamin is therefore entitled to no affirmative monetary recovery. The case is remanded to the commissioner solely for the purpose of determining the total amount by which plaintiff's indebtedness to the United States is to be reduced. The amounts thus far ascertained are:

Cause of Action:

| | |
|---|---:|
| No. 8 | $3,250.00 |
| No. 13 | 27,000.00 |
| No. 15 | 1,448.40 |
| No. 17 | 2,500.00 |
| No. 18 | 989.90 |
| No. 21 | 168.75 |
| No. 22 | 24,950.00 |
| No. 24 | 602.00 |
| No. 26 | 9,522.66 |
| | $70,431.71 |

Plaintiff is entitled to seek a determination by the commissioner of additional damages under Causes of Action Nos. 11 and 15, pursuant to Rule 47(c). Following any such determination, if one is sought, his entire petition is to be dismissed since he cannot obtain any affirmative recovery in this action. Meanwhile, the petition is dismissed as to the causes of action other than Nos. 8, 11, 13, 15, 17, 18, 21, 22, 24 and 26.